**Mary Lou GRAVES, Appellant (Claimant-Employee),**

v.

**UTAH POWER & LIGHT COMPANY, Appellee (Defendant-Employer).**

**No. 85–172.**

Supreme Court of Wyoming.

Jan. 22, 1986.

---

9. This opinion confirms and explains the order of reversal and vacation of injunction entered on October 31, 1985.

F.L. Thomas, Jr., Kemmerer, for appellant.

Mark W. Harris of Harris & Harris, Evanston, for appellee.

Before THOMAS, C.J., and ROONEY,* BROWN, CARDINE and URBIGKIT, JJ.

CARDINE, Justice.

This is a worker's compensation case in which we review the denial of a worker's claim for temporary total disability benefits. The district court denied the claim because the worker failed to show that her nontraumatic mental injury was caused by work-related stresses which were greater than day-to-day stresses and tensions expe-

* Retired November 30, 1985.

rienced by all employees in the same or similar jobs. Our review is essentially factual, and we can reverse only if we find that the district court's decision was clearly erroneous or contrary to the great weight of the evidence. We must also consider the matter of attorney's fees for this appeal. We affirm the judgment below and award attorney's fees in the amount of $750.

The claimant, Mary Lou Graves, became a B-operator at Utah Power and Light's Naughton Plant in 1981. As a B-operator, she monitored and operated the plant's pollution control equipment. According to claimant, the job itself was not physically or mentally stressful. In fact, her prior job as a beautician was much more stressful.

Nevertheless, during claimant's four years as a B-operator she was increasingly absent from work because of debilitating migraine headaches. She had suffered from headaches since childhood. She missed work 22 days in 1981, 41 days in 1982, 43 days in 1983, and 61.5 days in 1984. Of the days missed in 1983 and 1984, only 40 were covered by official vacation and sick days. She was reprimanded on various occasions for sick leave abuse, but the reprimands had no effect upon her absenteeism.

Because of poor attendance, plant management informed her in August of 1983 that she must bid into another job within two months or be demoted to the position of skilled helper.[1] A warehouse job within the company opened up in August and claimant successfully bid into the position. The company agreed to allow her to return to the Naughton job as B-operator as soon as her attendance improved in her new position.

Claimant's warehouse job was less desirable than her B-operator position because the warehouse job was in Evanston, a substantial commute from her Kemmerer home. The warehouse job also resulted in a cut in pay which eventually forced claimant to file a bankruptcy petition. She tried to force her reinstatement as a B-operator at the Naughton plant by filing a grievance with the employer, and when her grievance was denied, by filing suit in federal court. In April of 1984, claimant was permitted to bid back into her B-operator job after her attendance improved.

Claimant's return to her old job did not end either her headaches or her resultant attendance problems. While she had no trouble with her immediate supervisors, she did develop strained relations with fellow employees who were forced to fill in for her on numerous occasions. In July, claimant found a dead blackbird in her desk drawer, apparently placed there by another employee. She at first requested her supervisor to overlook the matter fearing that reprimands by management would only escalate the harassment. But eventually she told the plant manager of the incident and gave him the names of the suspected culprits. The manager reprimanded the suspects and their relations with claimant were further strained.

In late September of 1984, claimant's personal physician, Dr. Clark, sent a letter to the company suggesting that claimant be given time off to go to a pain clinic in Salt Lake City for migraine headache treatments. The company agreed and gave claimant a month off without pay. She attended the clinic from October 15 to October 26. She filed a claim for temporary total disability for the month of October; but, after the company paid her for the first nine days of the month, she amended her claim to cover 15 days of disability. The employer, Utah Power and Light, contested the claim on grounds that the headaches, which caused claimant to miss work, were not job related.

The district court tried the contested claim on March 5, 1985. At trial, claimant called Dr. David Clark who testified that claimant's work situation was the primary cause of her increase in headaches. But Dr. Clark was unable to compare the stress

---

**1.** Bidding into a job is a process through which the company assigns its job openings to its union employees. Those employees bid for the job in competition with each other, and the employee with the highest rating under the bargaining agreement receives the position.

facing claimant to the stress experienced by her co-workers because a proper foundation could not be established for the testimony. Claimant also called James Hackney, a psychiatric social worker from Kemmerer, who testified that work conditions contributed to claimant's headaches. Like Dr. Clark, Mr. Hackney could not say that the work conditions were unusually stressful.

In opposition to the claim, the employer called several of claimant's supervisors. Mr. Spencer Preece, claimant's immediate supervisor at the Naughton Plant, testified that she was not treated any differently than other employees at the plant. Ron Garner, the Naughton plant manager since 1982, stated that he treated her the same as any other employee with a similar record. He pointed out that he had issued reprimands, similar to those given to claimant, to another employee with an attendance problem. Finally, he testified that he tried to change claimant from a shift position to a day position to improve her attendance and that he encouraged her to seek medical attention.

The district court denied the claim, holding in a letter opinion that claimant failed to provide "substantial competent evidence that a situation or condition in her employment was any greater than day-to-day mental stresses and tensions all employees experience," and that "[t]he discipline [claimant] received for excessive absenteeism was not extraordinary or outside normal disciplinary procedures associated with her employment." Without a showing of unusual stress, the district court held that claimant could not receive disability benefits for her nontraumatic mental injuries.

### Nontraumatic Mental Injuries

Preliminarily we note that both parties agree that claimant's headaches were the result of a mental condition rather than physical injuries. They also agree that the headaches were not induced by a sudden event and can, therefore, be safely classified as nontraumatic mental injuries.

Our analysis of the law of nontraumatic mental injuries must begin with a review of *Consolidated Freightways v. Drake*, Wyo., 678 P.2d 874 (1984), the case upon which the district court based its decision. In Consolidated Freightways we held that a worker can recover for slowly developing mental injuries only if the injuries result "from a situation or condition in employment that is of greater magnitude than the day-to-day mental stresses and tensions all employees usually experience." Id. at 877. We based our holding upon the statutory definition of injury which requires that a harmful change in the human organism "[arise] out of" and "in the course of" employment "while at work" "in or about the premises [of the employer]." Section 27-12-102(a)(xii), W.S.1977. We essentially reasoned that a long-term change in a worker's mental condition "aris[es] out of" employment and is, therefore, a compensable injury only if it can be shown that there was a special employment stress causing the change or condition that is of greater magnitude than day-to-day stress usually experienced.

The rationale of our holding in *Consolidated Freightways v. Drake*, supra, is in accord with the policy of worker's compensation. Worker's compensation is a form of industrial accident insurance. *Cottonwood Steel Corporation v. Hansen*, Wyo., 655 P.2d 1226 (1982). The employer contributes to the fund what, in essence, are insurance premium payments, the amount being based upon his payroll for covered employees. A separate account is maintained for each employer, and his claim experience determines whether he must contribute a maximum or minimum percentage of his payroll to the fund, §§ 27-12-202 through 27-12-204, W.S.1977. It might be considered modern and forward looking for worker's compensation to be expanded to provide full coverage health insurance. But that was not its intended purpose, and it would be unfair to the employer who pays premiums on the assumption that they cover only injuries caused by his industry. Thus, where the employee suffers from a mental condition that was known,

symptomatic and which existed prior to employment, and the injury claimed is attributable to the same mental condition, it must appear that the injury "aris[es] out of employment" and is not simply a natural progression of the disease or condition.

*Consolidated Freightways v. Drake,* supra, is also consistent with enactments of the legislature in similar situations. Thus, when affording coverage for employment-related coronary conditions, the legislature enacted § 27–12–603(b), W.S.1977, which provides:

"Benefits for employment-related coronary conditions except those directly and solely caused by an injury or disease are not payable unless the employee establishes by competent medical authority that there is a direct causal connection between the condition under which the work was performed and the cardiac condition, and then only if the causative exertion occurs during the actual period of *employment stress clearly unusual to, or abnormal for, employees in that particular employment,* and further that the acute symptoms of the cardiac condition are clearly manifested not later than four (4) hours after the alleged causative exertion." (Emphasis added.)

The rule necessitating unusual stress adopted in *Consolidated Freightways v. Drake,* supra, satisfies for us the requirement that, for an award of compensation, there must be "a nexus between the *injury* and some condition, activity, environment or requirement of employment." (Emphasis added.) *Matter of Injury to Willey,* Wyo., 571 P.2d 248, 250 (1977). If the injury occurs outside of the course of employment, it is not compensable, whether the worker be predisposed to injury or perfectly healthy. With respect to physical injury, the evidence establishing the nexus in claims such as heart attack or back

injury often is testimony of some lifting, pushing, pulling, trauma or exertion while at work that results in pain or some demonstrable change in the human organism. In asbestosis claims, it can be shown that the injury, though developing over a considerable period of time, occurred only while at work and arose out of the employment, there usually being no other exposure to asbestos.

A claim for disability for a mental condition, which results from migraine headaches that existed before employment, continued after employment, and occurred at divers times and places, must be treated differently from those manifested by physical injury. As Professor Larson states in his worker's compensation treatise:

"The real distinction here should be, not between sudden and gradual stimuli, but between gradual stimuli that are sufficiently more damaging than those of everyday employment life to satisfy the normal 'arising-out-of' test, and those that are not." 1B Larson, Workmen's Compensation Law § 42–23(b), p. 7–639 (1985).

■ It has been suggested that the rule we announced in *Consolidated Freightways v. Drake,* supra, 678 P.2d 874, creates a confusing double standard for mental injuries. 20 Land & Water L.Rev. 287 (1985). We adopted our position deliberately; and, after due consideration of the alternatives, we do not think it is at all confusing. An especially sensitive worker, the so-called eggshell, can receive compensation for a *physical* injury if ordinary work conditions cause the injury.[2] On the other hand, when *nontraumatic mental* injuries are involved, the eggshell is eligible for compensation only if he can show that extraordinary work conditions caused the injury.[3]

---

**2.** In *Exploration Drilling Company v. Guthrie,* Wyo., 370 P.2d 362, 364 (1962), we said:

"It is well settled in Wyoming that compensation is not made to rest upon the condition of health of the employee or upon his freedom from liability to injury through a constitutional weakness or latent tendency. Also it mat-

ters not, as far as the right to compensation is concerned, whether the weakness or liability to injury has come about by disease or existed from birth."

**3.** It is worth noting that this rule does not require especially susceptible individuals to prove that work stimuli is the preponderant cause of

We think the common-sense reasons for the rule we adopt outweigh other considerations. If we allowed workers to recover for long-term mental injuries when those injuries were triggered by everyday work stress, then almost all mental injuries would be compensable from the worker's compensation fund. There are very few workers with nontraumatic mental problems who cannot show that job stress contributed to their problems. The employers would become insurers for almost all mental illnesses suffered by their employees. *Townsend v. Maine Bureau of Public Safety,* Me., 404 A.2d 1014, 1018–1019 (1979).

In addition, the district courts would have great difficulty distinguishing between legitimate claims of mental injury and malingering. As the Supreme Judicial Court of Maine has stated,

"[t]he danger of illusory and fictional claims is as real and present in workers' compensation as it is in the law of torts. Where a mental injury occurs rapidly and can be readily traced to a specific event, * * * there is a sufficient badge of reliability to assuage the Court's apprehension. Where, however, a mental injury develops gradually and is linked to no particular incident, the risk of groundless claims looms large indeed." Id. at 1018.

We stand by our holding in Consolidated Freightways v. Drake, supra.

"This standard appropriately balances the interest of the employee and the in-

their mental injuries. The eggshell is taken care of as long as he can show that his mental injury arose out of an unusual employment stress and therefore can "fairly be traced to the employment as a proximate cause." Section 27–12–603(a)(iii), W.S.1977 (June 1983 Replacement). See also 1B Larson, Workmen's Compensation Law § 42.23, at 7–640 (1985).

**4.** Maine creates an alternative test which allows some workers who suffer nontraumatic mental injuries to receive compensation even though they cannot show that they faced abnormal stresses. If a Maine worker can show, by *clear and convincing evidence,* that normal work stresses were the predominant cause of his mental injury, he is eligible for compensation. Thus, Maine "protects even the eggshell."

terests of the employers as well as incorporates the policy and intent of Wyoming worker's compensation laws." 678 P.2d at 877.[4]

Our decision to reaffirm the Consolidated Freightways holding does not prevent us from addressing interpretive problems created by that holding. In Consolidated Freightways we stated

"that a non-traumatically caused mental injury is compensable under our worker's compensation law if it results from a situation or condition in employment that is of greater magnitude than the day-to-day mental stresses and tensions *all employees usually experience.*" (Emphasis added.) 678 P.2d at 877.

Although an objective standard of comparison is clearly created, we have never explicitly delineated the group of "all employees" whose tensions are to be compared with the tensions suffered by the worker seeking benefits. Id. at 877–878; see also *Baker v. Wendy's of Montana, Inc.,* Wyo., 687 P.2d 885 (1984).

The objective "all employees" standard could be based upon three different groups. First, "all employees" could consist of a worker's "fellow employees" employed in the same or similar jobs by the same employer. Second, it could consist of workers in the same or similar jobs, including those who work for other employers. Finally, it could consist of the "working world at large."

*Townsend v. Maine Bureau of Public Safety,* Me., 404 A.2d 1014, 1019–1020 (1979).

The problem with Maine's alternative test is that it adopts a clear-and-convincing-evidence standard which cannot be found in our statutes. Section 27–12–603(a), W.S.1977 (June 1983 Replacement), specifically states that

"[t]he burden of proof in contested cases involving injuries which occur over a substantial period of time is on the employee to make proper proof of his claim by a *preponderance of the evidence,* and to also prove by competent medical authority that his claim arose out of and in the course of his employment, by showing by a *preponderance of the evidence* that * * *."

We could not adopt the Maine test without violating § 27–12–603(a).

We think the most rational approach to deciding whether a worker is subject to unusual stress is to compare his stress with the day-to-day stress generally encountered by workers in the same or similar jobs regardless of their employers. Unlike the "fellow employees" test, this test could be used in cases where the worker has no fellow employee holding the same job in his company. Moreover, under the same or similar job standard, an employer who puts excessive stress on several employees could not avoid the payment of benefits by simply making that excessive stress equal for all employees. The stress on his workers would be compared to the stress suffered by those holding similar jobs in other companies.[5]

We recognize that other factors must also be considered in finally determining whether the stress is unusual for the particular job involved. An employer may pay twice the average rate to an employee who will accept greater responsibility and thus greater stress. That greater stress may be usual in that situation. Some of the factors that may be considered are rate of pay, benefits, working conditions, opportunity, position, and future rewards. The result of these factors may be that the jobs sought to be compared are not the same or similar.

The objective test based on workers with the same or similar jobs is also superior to a test based on the working world at large. It is impossible to determine, except in the broadest fashion, the stress to which the working world at large is exposed. In every worker's compensation case heard under this test, the parties could call witnesses whose job-related stress is either significantly greater or significantly smaller than the stress suffered by the worker seeking compensation. The standard would be too amorphous to be practical.

We approach the case at hand with the following principles in mind. A worker seeking compensation for nontraumatic mental injury must show that the injury was caused by workplace stress of greater magnitude than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs. The "other workers" can be those employed by the same employer or by different employers.

### The Decision Below

In the case at bar, the district court applied the law as we have outlined it above. The court explicitly stated in its conclusions of law:

"3. The Court, as a matter of law, is unable to find specifically that:

"A. Employee provided substantial competent evidence that a situation or condition in her employment was any greater than day-to-day mental stresses and tensions all employees experience.

"B. Employee did not assume or perform duties as a B-operator that other B-operator [did not] regularly [perform].

"C. The discipline Employee received for excessive absenteeism was not extraordinary or outside normal disciplinary procedures associated with her employment."

Because the correct law was applied below, the only issues we must face in this appeal are factual. Applying the appropriate standard of factual review, we must decide whether claimant carried her burden of proving unusual workplace stress by a preponderance of the evidence.

"When reviewing cases on appeal, we accept the evidence of the prevailing party as true, leaving out entirely the consideration of evidence presented by the unsuccessful party in conflict therewith, giving every favorable inference which may fairly and reasonably be drawn from the prevailing party's evidence. The findings of fact made by the trial court are presumed to be correct, and we will not disturb such findings unless inconsistent with the evidence, clearly erro-

---

5. Under our preferred test, the stresses of other workers in the same company with the same or similar jobs will usually be most persuasive and determinative of the issue. They are not controlling, however, in the face of a conflicting industry-wide standard.

neous or contrary to the great weight of the evidence." (Citations omitted.) *Matter of Injury to Abas,* Wyo., 701 P.2d 1153, 1156 (1985).

We agree with the district court that claimant failed to carry her burden of proving unusual workplace stress. While claimant's witnesses testified to the causal connection between workplace stress and her migraine headaches, they never testified that claimant was subjected to stress of greater magnitude than day-to-day mental stresses experienced by other workers in the same or similar jobs. Claimant did not call a single witness to compare the disciplinary procedures she experienced to those prevailing in her company or industry. In fact, the only witnesses who made these comparisons were called by the employer. Both Mr. Preece and Mr. Garner stated that they did not subject claimant to unusual sanctions for her absenteeism. Mr. Garner pointed out that he tried to reduce the stress on claimant by suggesting medical treatment and offering her a daytime, nonshift, B-operator's position.

We do not think that the dead bird incident was unusually stressful under the circumstances. Workers in an industrial job like claimant's can expect some resentment and even harassment from fellow workers who must work double shifts because of their fellow employee's absenteeism. Moreover, claimant's supervisors, Mr. Preece and Mr. Garner, responded to the dead bird incident according to claimant's wishes by at first downplaying the incident and then by reprimanding those responsible. We can only hope that this kind of cooperation with the harassed worker is the industry standard.

Claimant contends in her brief that the stresses that caused her mental harm were unique because no other workers suffered from migraine headaches like she did. She argues that her headaches caused unusual stress which in turn caused more headaches. This argument is improperly based on a subjective standard. Under the proper objective standard, we need only decide whether the disciplinary procedures and worker harassment suffered by claimant as a result of her headaches and absenteeism were the same as would be suffered by any other worker in a similar job under those circumstances. We think that the district court had substantial evidence to conclude that claimant did not suffer objectively unusual stress. The court's decision was not clearly erroneous.

## Attorney's Fees

Claimant has moved that we award her attorney a fee of $5,392.50, to be paid from the worker's compensation fund, for his work on this appeal. The motion is based upon § 27–12–604(c), W.S.1977 (June 1983 Replacement) which states:

"The district court may appoint an attorney to represent the employee or claimants and shall allow him a reasonable fee for his services at the conclusion of the proceeding. The attorney shall be paid according to the order of the court either by the director or from the amounts awarded to the employee or claimants or from the employer."[6]

If we interpret the word "proceeding" to include only trial proceedings, then this statute does not authorize the court to order appellate fees. On the other hand, if proceeding means the entire case through appeal, then we may set a reasonable appellate fee.

We think that the word "proceeding" should be interpreted broadly to authorize the award of appellate fees in worker's compensation cases. We reach this conclusion by interpreting § 27–12–604(c) so that it can be read together with § 27–12–609, W.S.1977 (June 1983 Replacement) to form a rational statutory scheme. Section 27–12–609(a) states that

"[a] person or attorney shall not receive a fee for procuring any benefit under this act [§§ 27–12–101 through 27–12–

6. "It is generally recognized that attorney's fees are not recoverable in the absence of express statutory or contractual obligation." *Bowers*

*Welding and Hotshot, Inc. v. Bromley,* Wyo., 699 P.2d 299, 307 (1985).

804] which exceeds the amount determined by the court under W.S. 27–12–604(c)."

In addition, § 27–12–609(b) states that

"[e]very person violating this section is guilty of a misdemeanor and upon conviction shall be fined not more than five hundred dollars ($500.00), to which may be added imprisonment in the county jail for a term not to exceed ninety (90) days."

In essence, § 27–12–609 funnels all awards of attorney's fees in worker's compensation cases through § 27–12–604(c). If we were to hold that we could not order payment of appellate fees under § 27–12–604(c), then no attorney could be legally paid for representing a worker on appeal. As a result, few, if any, lawyers would voluntarily take such appeals. The worker's only choice would be to find an attorney willing to take his appeal pro bono, or to appeal pro se. The worker would be opposed by an employer represented by a paid attorney. Section 27–12–609(a) only prohibits the unauthorized payment of attorneys who procure "any benefit" under the act. It does not prevent an employer from hiring a lawyer to contest benefits.

We do not think that the legislature could have intended a system in which the deck is stacked so heavily against the workers. "This court has adopted a policy of liberally construing statutes relating to worker's compensation in light of their beneficent purpose." *Conn v. Ed Wederski Construction Company,* Wyo., 668 P.2d 649, 652 (1983). We believe that the critical word "proceeding" in § 27–12–604(c) should be interpreted broadly to permit us to set reasonable attorney's fees for worker's compensation appeals.

■ We note that most worker's compensation appeals involve a single issue. Often the lawyer taking the appeal is the same lawyer who represented the worker below and is already familiar with both the facts and law. Consequently, on October 31, 1984, we issued an order setting the sum of $750 as a presumptive reasonable fee for worker's compensation appeals.[7] That order does not force us to set a fee of $750 in all cases, but it does serve as guide for appellate fees and for our fee analysis which follows. See appendix for text of order.

■ If claimant had prevailed in this case, she could have been awarded, at most, $840. This figure represents two-thirds of her wages for fifteen-day period during which her migraine headaches forced her to miss work. Section 27–12–402(a), W.S.1977 (June 1983 Replacement). In the contest over this $840 claim, the worker's compensation fund has already paid fees of $2,317.50 to claimant's attorney for his representation at trial. That payment was approved by the district court under the authority of § 27–12–604(c), W.S. 1977 (June 1983 Replacement).

In the context of a private civil case where the litigant pays her own attorney's fee, such a fee would hardly be reasonable with just $840 at stake. We will not further comment upon the district court's award of fees, however, because neither the employer nor the worker's compensation division has raised the issue. Also, we realize that § 27–12–604(c) was intended by the legislature to provide workers with adequate trial representation when confronting employers with greater resources. If attorney's fees were never paid in minor cases, then some employers might contest even the most meritorious minor claims, hoping to win by default.

Claimant's award of $2,317.50 for trial attorney's fees is relevant to our analysis of appellate fees. Claimant's attorney prepared for trial to the extent of earning a $2,317.50 fee. Much of his preparation should have carried over to this relatively simple appeal. The record bears out this observation. Claimant's lawyer raised the same legal and factual issue in this appeal

---

**7.** Until it was repealed in 1983, § 27–12–609, W.S.1977, set a presumptive attorney's fee of $500 for worker's compensation appeals.

as he raised below. He filed a sixteen page brief involving a single issue which is controlled by a single, recent Wyoming case, *Consolidated Freightways v. Drake*, supra. The statement of facts, which consumed five and one-half pages of claimant's brief, should have been easily written because counsel tried the case below and was already familiar with the facts.

Claimant's motion for appellate fees of $5,392.50 cannot be justified. The issue on appeal was relatively simple and well known to claimant's attorney. We believe that $750 is a reasonable attorney's fee for this appeal.

The judgment of the district court is affirmed and appellant's motion for attorney's fees is granted in the amount of $750. We cannot grant appellant's motion for costs until submission of receipts as required by our order of October 31, 1984.

URBIGKIT, J., concurs in part and dissents in part.

### APPENDIX

### IN RE ATTORNEY FEES FOR APPEAL OF WORKER'S COMPENSATION MATTERS

### IN THE SUPREME COURT, STATE OF WYOMING

### OCTOBER TERM, A.D. 1984

### ADMINISTRATIVE ORDER

The Court hereby establishes the following as reasonable compensation to be allowed attorneys for appeals in worker's compensation cases:

Seven Hundred and Fifty dollar ($750.00) fee.

Travel and per diem amounts as authorized by law for state employees.

Other expenses as are supported by receipts and determined to be necessary by the Court.

Dated October 31, 1984.

By the Court

s/ John J. Rooney
John J. Rooney
Chief Justice

URBIGKIT, Justice, concurring in part and dissenting in part.

I would concur with the disposition of legal fees afforded by the majority. However, it is suggested in addition that the legislature should be invited to directly consider the subject in its current review in order to afford specific statutory direction and authority as once existed before the present inopportune deletion. In that context, the constitutional concerns are noted that Art. 10, § 4 of the Wyoming Constitution, as effectuating the worker's compensation exception, can realistically be read to contemplate availability of Art. 1 constitutional due-process rights in the application of worker's compensation benefits for covered employees. See 3 Larson, Workmen's Compensation Law § 78.42(e), p. 15–229. *New York Central R.R. Co. v. White*, 243 U.S. 188, 201, 27 S.Ct. 247, 252, 61 L.Ed. 667 (1917).

I would find that those constitutional guarantees should include reasonably available appeal opportunities which, by definition, would also include legal fees to provide adequate counsel.

"* * * The right of each employee to compensation from such fund shall be in lieu of and shall take the place of any and all rights of action against any employer contributing as required by law to such fund in favor of any person or persons by reason of any such injuries or death." Article 10, § 4, Wyoming Constitution.

I respectfully dissent from the decision of the majority in their application of the test of *Consolidated Freightways v. Drake*, Wyo., 678 P.2d 874 (1984) through effectuation of the greater magnitude than the day-to-day mental-stress test as derived from the case law of Wisconsin.

It is recognized that the majority clearly, carefully and with thoughtfulness applied the Consolidated test which in philosophy had been approved by all members of the court in that case.

Not then serving on this court, I now find no justification, directly stated, for the mental-injury differentiation in constitutional provision, statutory enactment or medical fact. Injury is injury in result, whether mentally or physically induced, except that the dehabilitating aspects of many physical injuries are the associated mental results. Mental injury can cause physical result, and many physical injuries result in mental impairment or operational injury.

The anachronism of differentiation which is slowly being recognized in a diminished application in the employee-injury compensation cases should be eliminated from our law, and the claimant employees subjected to the same test, whether mental or physical injury, at least, in the absence of a specific statutory differentiation as constitutionally applied.[1] See 1B Larson, Worker's Compensation Law, § 42.23(a), p. 7–632, "[T]here is no really valid distinction between physical and 'nervous' injury." See also Annot., 97 A.L.R.3d 165, Workmen's Compensation—Mental Disorders.

Under Wyoming law, I would follow the Oregon approach, *Korter v. EBI Companies, Inc.*, 46 Or.App. 43, 610 P.2d 312 (1980); *Matter of Shilling*, 46 Or.App. 117, 610 P.2d 845 (1980). See discussion, Note, *Workmen's Compensation—A Confusing Double Standard for Mental Injuries*, XX Land and Water L.Rev. 287, 295 (1985). Cf. 1B Larson, Workmen's Compensation Law, § 42.22, p. 7–597. See also *Williams v. Western Electric Company*, 178 N.J.Super. 571, 429 A.2d 1063 (1981), and *Townsend v. Maine Bureau of Public Safety*, Me. 404 A.2d 1014 (1979).

Furthermore, withdrawal from the enunciated principle that worker's compensation law should be liberally construed to serve the purpose intended is not justified by differentiation of an injury as mental and not physical. *Matter of Johner*, Wyo., 643 P.2d 932 (1982); *Conn v. Ed Wederski Construction Company*, Wyo., 668 P.2d 649 (1983).[2]

A comprehensive review of the record in this case provides thought that a nondifferentiated injury test would not necessarily or even probably change the denial status. It is not my thought that the result is sufficiently inappropriate in consideration of all of the evidence adduced at trial for a mandated reversal of the order in judgment in order to grant benefits, but only that a differentiated test for injury resulting from mental and not physical invasive factors should not be continued.

I would reverse for the trial court to determine on the existing record whether the claimant suffered a job-related injury by determining whether she was injured in the covered employment, by court application of the same rules which would be applied as if the question was whether she lost a finger from a work-related machine.

**1.** We are obviously talking about cause, not result. Clearly, a migraine headache is in all regards overt, self-evident and dehabilitating, as much as stomach ulcers, either or both of which may result from emotional involvement in a direct, causative relationship. See 4B Chapman, Courtroom Medicine, Pain and Suffering § 100.45, Migraine, p. 100–85, and 4 Chapman, supra, § 2.00, Definitions of Pain, p. 2–2; *National Lumber & Creosoting Co. v. Kelly*, Colo., 75 P.2d 144 (1937). There is no question in this case from a review of the evidence but that the migraine headaches were disabling. The sole question was whether that physical condition was the result of a job-related condition, causatively resulting in injury. Migraine headaches can arise from a "wide variety of etiological factors." Commonly, during and preceeding a headache attack, resentment, tension, fatigue, or exhaustion are prominent. The text further notes that an important psychological aspect of treatment is to attempt to make the patient aware of the relevance of headaches to attitudes, goals, values, and effort patterns. 4A Chapman, supra, § 21.10, Definition and Categories of Headaches, p. 21–6.

**2.** We should be careful to avoid mixing adjectives and adverbs. Migraines are normally a physical condition mentally induced, as is frequently the case with stomach ulcers; a gunshot wound is a physical condition physically induced; trauma psychosis is frequently a mental condition physically induced. All are injuries to the "whole self."