Gloria WILLIAMS,
Employee/Appellant,

v.

DePAUL HEALTH CENTER,
Employer/Respondent.

No. 74275.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 11, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 10, 1999.

Application for Transfer Denied
Aug. 24, 1999.

Brian H. May, Larsen & Feist, St. Louis, for appellant.

John S. Cullinance, The Cullinance Law Firm, St. Louis, for respondent.

HOFF, Presiding Judge.

Gloria Williams (Employee) appeals from the decision of the Missouri Labor and Industrial Relations Commission (Commission) reversing the award of the Administrative Law Judge (ALJ) and denying her workers' compensation benefits for mental injury allegedly resulting from work-related stress (mental/mental claim) during her employment with DePaul Health Center (Employer). As a matter of first impression, we clarify the standard applicable to mental/mental workers' compensation claims in Missouri, and affirm.

The Commission found the facts as follows. Employee began working for employer in August 1982 as a medical technologist. She received annual reviews of her work performance. Before May 1994, Employee sought a position in the "stat lab."

A job as temporary section manager of the hematology department became available and she took that position. This new position increased her pay from approximately $16.60 per hour to more than $18.00 per hour.[1] Employee continued to perform duties as a medical technologist and had fewer responsibilities in her additional role as a temporary section manager than the responsibilities of the predecessor in that position. "The [Employee] was no longer responsible for the blood bank section. She was given authority to use per diem workers and to pay overtime in order to accomplish the medical technology aspect of the job. She was also paid overtime for any work she was required to take home."

In her position as acting section manager, Employee "became involved in the calibration and testing of two new coagulation machines." Employer sent her to New York for training on the new machines. While she was there, Employee's supervisors decided to relieve Employee of the responsibility of bringing the new equipment "on line." Employee's supervisor, Judy Colonbini (Colonbini), testified that

the medical director and pathologist had expressed concern on two or three occasions that "he was not able to frankly, make heads or tails out of the data that [Employee] was giving him." . . . At the time the [Employee's] New York travel arrangements were made, it had not yet been determined whether the [Employee] was the cause of the problems in bringing up the equipment.

A co-employee, Wendall Allmon (Allmon), was thereafter given the duties regarding the new equipment and sent to New York for training. On November 27, 1994, Allmon became the permanent section manager.

Employee filed a complaint with the Equal Employment Opportunity Commission contending she did not receive the permanent section manager position as a result of age and sex discrimination.

1. "The salary range for a section manager

In this workers' compensation proceeding, Employee contends she did not get the permanent section manager position "because she refused to lie about the performance of one of the machines." The Commission found Employee's supervisor, Colonbini, refuted Employee's testimony and then accepted Colonbini's testimony as credible. Specifically, the Commission found Employee's

belief that the employer retaliated against her is nothing more than conjecture. The [Employee] never disputed Ms. Colonbini's testimony that there were some problems with the [Employee]'s operation of the machines prior to her trip to New York. Ms. Colonbini's testimony that the pathologist was unhappy with the [Employee]'s work performance also is unrefuted. As Ms. Colonbini explained, the [Employee] had no responsibility or input regarding the purchase of the machines. There was no reason to ask her to lie about the machine's performance.

Furthermore, the Commission found the record did not support the ALJ's determination that Employee "was relieved of her duties as acting section manager the 'next day' after the [Employee] refused to cooperate in some alleged conspiracy regarding the return of one of the coagulation machines (Award page 4)." In particular, the Commission noted Employee testified that, the day after this conversation, she was relieved of her training duties pertaining to the machines, which was in September or October, and those duties were given to Allmon. Employee

indicated that it was at least one month later that Mr. Allmon was designated the permanent section manager. . . . According to Ms. Colonbini, Mr. Allmon was given the responsibilities of training in July and was named [permanent] manager in mid-November. . . . Irrespective of the exact timing, it is clear that there was a considerable lapse between the conversation that the [Em-

was $16.55 to $26.55 per hour."

ployee] was supposed to have had with Ms. Colonbini and the promotion of Wendall Allmon.

The Commission concluded "[r]ather than retaliation for refusing to participate in some purported conspiracy or to lie, the [Employee]'s performance as a section manager was not exemplary" and that was the reason why the permanent position of section manager was not given to Employee. Specifically, the Commission stated:

> During the six and½ months the [Employee] served as temporary section manager she was given a performance review for her work as a medical technologist. Her review in that respect was "an average performance generally.".... She was not formally rated with respect to her performance as a section manager because she had not held that position for a sufficient period of time prior to the scheduled annual performance review. Ms. Colonbini said she did have some informal discussions with the [Employee] regarding deficiencies in her work, although nothing had been placed in the [Employee's] personnel file. Even the [Employee] admitted that she found it difficult to complete all of her assigned duties. The [Employee] also admitted that at the time she was relieved of her duties relating to the coagulation machines, she did not have the machines operating to the satisfaction of Dr. McCarthy, the head of the technology department.

In early December 1994, Employee resumed her prior duties as a medical technologist. The Commission further found:

> Pursuant to her earlier request to be on the stat lab team, the [Employee] was given a refresher course in chemistry and appointed to that position. The new job required the [Employee] to work rotating shifts and varied hours, but all of the shifts started in the morning. There is no evidence that she was required to work late nights or more than two weekends per month. Employer's Exhibit 2 demonstrates that [Employee]'s work was no more onerous that that of her co-workers in the terms of starting times, number of hours and days worked. During the month of February 1995, the [Employee] had worked 20 days. Another employee with a similar title worked 19 days. According to the exhibit, the other employee also had worked in the stat lab. The [Employee] said she did not know about the employees' schedules, she only knew about her work schedule. She said she also did not know about any training that the other workers were required to attend. In February 1995, the [Employee]'s son was involved in an automobile accident while driving the [Employee]'s car. In March 1995, the [Employee] developed the fear of driving and suffered a panic attack. On or about February 27, 1995, the [Employee] complained of a headache at work and was referred to the employee health department. She was diagnosed with high blood pressure, told to schedule an appointment with a physician and sent home.
>
> On March 2, 1995, the [Employee] saw Dr. Fox who recommended a two week leave of absence from work and referred her to Dr. Kreisman, a psychiatrist. Dr. Kreisman treated the [Employee] on six occasions until October 1995 but she continued to see Dr. Fox as needed. The [Employee] contends she was drowning financially and asked Dr. Fox to release her to work. On March 26, 1996, Dr. Fox reported that the [Employee] was doing quite well and that Dr. Kr[ei]sman concurred. Dr. Fox also wrote that Dr. Kr[ei]sman did not believe any follow up was necessary. Dr. Fox released the [Employee] to return to work but to remain on the same shift for a period of one month. Dr. Fox indicated that the [Employee] could then return to work without restrictions.... The physician's records do not substantiate the [Employee's] contention that she was released to return to work only on a part-time basis or that the release was in response to the [Employee]'s request.

When the [Employee] sought to return to work she was told that her position had been filled pursuant to the [Employer]'s personnel policy. This was approximately one year after she had last worked for the [Employer]....

The Commission then summarized the testimony of four experts who presented testimony in this workers' compensation proceeding.

The Commission concluded the claim should be denied because Employee had "presented absolutely no objective evidence to substantiate her claim that she was exposed to unusual or excessive work stress when compared to other medical technologists or section managers for this or any other employer." In particular, the Commission stated:

The [Employee] was the only witness to testify on her behalf about the level of stress she experienced at [Employer]. The [Employee]'s testimony obviously involves her subjective perceptions. The [Employee] provided no evidence that her hours, shifts, days, or job duties were extraordinary or unusual when compared with other medical technologists or section managers at [Employer] or anywhere else. When specifically given the opportunity to compare her work schedule with others, she responded that she only knew about her own schedule.

By contrast Ms. Colonbini, testifying on behalf of the employer, indicated that the shift schedule for all day shift employees of the hematology department was the same or similar to that of the [Employee]. Her testimony is substantiated by Employer Exhibit 2. Although the [Employee] was expected to complete medical technologist work in addition to serving as acting section manager, her managerial duties were ½ those of her predecessor. She was given latitude to hire additional per diem workers and pay overtime in order to reduce her own work load. While the [ALJ] found that the [Employee] was required to be on call 24 hours a day, the evidence reveals in six and ½ months the [Employee] was called "maybe more than twice".... There is a dispute in the record regarding the [Employee]'s pay but her supervisor stated that the [Employee's] salary was within the range of section managers. The [Employee] received overtime for any extra work she performed at home. When the position was given to another worker, the [Employee] was given the job in that stat lab which she previously had pursued. This evidence indicates that the employer attempted to accommodate rather than inconvenience the [Employee].

Additionally, the Commission concluded the claim for compensation must be denied because Employee failed to prove "her mental injury or disease resulted from something other than legitimate personnel actions which had been taken in good faith by the employer"; and because "the most credible expert testimony on the issue of causation [was] that of Dr. Wayne Stillings," who found no causal connection between Employee's condition and her work for Employer. Therefore, in a two-to-one decision, the Commission reversed the ALJ's award and denied Employee's workers' compensation benefits. This appeal followed.

Employee contends the Commission erred as a matter of law in making its award because (1) it adopted the "objective causal nexus" test enunciated by the Wyoming Supreme Court in *Graves v. Utah Power & Light Co.*, 713 P.2d 187 (Wyo. 1986), rather than following the Missouri legislature's requirement that the stress be "extraordinary" and "unusual" as set forth in Section 287.120.8 RSMo 1994;[2] (2) it found Employer's actions were taken in good faith when the overwhelming weight of the evidence presented by Employee demonstrates Employer's actions were taken in bad faith; and (3) its findings on medical causation were against the overwhelming weight of the evidence because

2. All subsequent Missouri statutory references are to RSMo 1994.

Employee presented evidence showing her condition was directly related to her employment.

### Standard of Review

■ On appeal from a Commission decision in a workers' compensation proceeding, we review only questions of law. *Wiele v. National Super Mkts., Inc.*, 948 S.W.2d 142, 145 (Mo.App. E.D.1997); Section 287.495. "We can modify, reverse, remand for rehearing, or set aside awards based on factual determinations only on the grounds prescribed by statute." *Wiele*, 948 S.W.2d at 145. The statutory grounds are limited to the following:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

Section 287.495.1. When a Commission's decision is based on determinations of fact, we review the whole record in the light most favorable to the decision. *Wiele*, 948 S.W.2d at 145. We defer to the Commission's resolution of issues concerning credibility and the weight given to conflicting evidence. *Id.* "[I]n the absence of fraud, the findings of fact made by the [C]ommission within its powers [are] conclusive and binding." Section 287.495.1.

■ We are not, however, bound by any decision of the Commission in a workers' compensation proceeding that is clearly an interpretation or application of law, rather than a determination of fact. *West v. Posten Constr. Co.*, 804 S.W.2d 743, 744 (Mo. banc 1991). Such decisions "fall within [the appellate court's] province of review and correction." *Id.; accord Watkins v. Bi–State Dev. Agency*, 924 S.W.2d 18, 21 (Mo.App. E.D.1996). Additionally, when a finding of ultimate fact is reached by the Commission through the application of rules of law, rather than by natural reasoning based on facts alone, such a finding

is a conclusion of law subject to review by the appellate court. *Merriman v. Ben Gutman Truck Serv., Inc.*, 392 S.W.2d 292, 297 (Mo.1965).

Moreover, when as here the Commission reverses the findings and award of the ALJ, we engage in the two-step analysis set forth in the Western District's *en banc* decision in *Davis v. Research Medical Ctr.*, 903 S.W.2d 557, 570 (Mo.App. W.D.1995). *Wiele*, 948 S.W.2d at 145. This analysis requires the appellate court first to examine

the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the award is supported by competent and substantial evidence. At this stage, the court may disregard the credibility determinations of the ALJ because it is viewing the evidence in the light most favorable to the award. If there is such evidence, it moves on to the second step of the analysis to determine whether the award is against the overwhelming weight of the evidence. In this stage of the review, the court views the evidence in the light most favorable to the award but must consider all the evidence in the record, including that which opposes or is unfavorable to the award.

*Wiele*, 948 S.W.2d at 145 (internal quotation marks omitted) (quoting *Davis*, 903 S.W.2d at 570).

### Extraordinary and Unusual Stress

In her first point, Employee contends the Commission erred as a matter of law because it adopted the "objective causal nexus" test enunciated by the Wyoming Supreme Court, rather than following the Missouri legislature's requirement that the stress be "extraordinary" and "unusual" as set forth in Section 287.120.8. Employee urges the Commission's standard improperly imposed on her a new and greater evidentiary burden. Employer counters there was no objective evidence, but only subjective evidence, presented by Employ-

ee to satisfy the Missouri statute; substantial and competent evidence supports the Commission's decision; and the test adopted by the Wyoming Supreme Court was not necessary to the Commission's result.

The Commission determined the relevant inquiry was whether Employee's mental condition was causally related to her work, an issue whose resolution was controlled by Section 287.120.8. Noting that Missouri appellate case law addressing mental/mental claims prior to the enactment of this statute was sparse and after its enactment was non-existent, the Commission interpreted the statute as requiring an employee to establish actual, rather than perceived or imagined, employment events caused extraordinary and unusual work-related stress as demonstrated by objective standards. The Commission then looked to case law from other jurisdictions to ascertain a formulation for what objectively constitutes extraordinary and unusual stress. Noting there are three possible objective measurements,[3] the Commission agreed with the test adopted by the Wyoming Supreme Court in *Graves, supra.* That test requires a

3. The Commission specifically discussed the possibility of comparing the employee's stress to that of other employees "in the same classification for the same employer" or of comparing the employee's stress "to all other workers in the workforce, generally" or of comparing the employee's stress to "other workers in the same or similar job regardless of their employers."

4. We do not find *Graves, supra,* persuasive because, subsequent to that decision, the Wyoming state legislature passed a workers' compensation statutory provision defining injury in part as excluding "[a]ny mental injury unless it is caused by a compensable physical injury, it occurs subsequent to or simultaneously with, the physical injury and it is established by clear and convincing evidence." *Pinkerton v. State ex rel. Wyoming Workers' Safety & Compensation Div.,* 939 P.2d 250, 251 (Wyo.1997) (internal quotation marks omitted) (quoting Wyo. Stat. Section 27–14–102(a)(xi)(J) (Cum.Supp.1996)).

5. *McClain* was subsequently modified or overruled by the Arkansas legislature through passage of a statute allowing compensation for a

determination "whether a worker is subject to unusual stress [by] compar[ing] his stress with the day-to-day stress generally encountered by workers in the same or similar jobs regardless of their employers." *Graves,* 713 P.2d at 193.[4] In further support of this test, the Commission cited *Dunlavey v. Economy Fire and Casualty Co.,* 526 N.W.2d 845 (Iowa 1995); *McClain v. Texaco, Inc.,* 29 Ark.App. 218, 780 S.W.2d 34 (1989);[5] and *Collado v. City of Albuquerque,* 120 N.M. 608, 904 P.2d 57 (1995).[6]

■ In addressing Employee's first point, we must decide whether the test adopted by the Commission is appropriate for resolution of mental/mental cases in Missouri. Section 287.120.1 provides in pertinent part that "[e]very employer ... shall be liable, irrespective of negligence, to furnish compensation ... for personal injury ... of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefor whatsoever, whether to the employee or any other person." This statute further provides that

mental injury or illness only caused by a "physical injury to the employee's body." *Phillips v. Arkansas State Highway & Transp. Dep't,* 52 Ark.App. 170, 916 S.W.2d 128, 130 n. 2 (1996) (internal quotation marks omitted) (quoting Ark.Code Ann. Section 11–9–113 (Supp.1995)).

6. The court in *Collado,* specifically noted the parties did not dispute that New Mexico authority does not permit compensation for a mental injury resulting from gradual stress. *Collado,* 904 P.2d at 64. *See also* N.M. Stat. Ann. 52–1–24(B) (Michie 1991) which compensates a mental injury without a physical injury (what New Mexico refers to as a "primary mental impairment") when the employment-related accidental injury "consists of a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances, but is not an event in connection with disciplinary, corrective or job evaluation action or cessation of the worker's employment."

Mental injury resulting from work related stress does not arise out of and in the course of the employment, unless it is demonstrated that the stress is work related and was extraordinary and unusual. The amount of work stress shall be measured by objective standards and actual events.

Section 287.120.8. As the Commission did, we read this section to require that "objective standards and actual events" must be used to ascertain whether the work-related stress "was extraordinary and unusual." The legislation does not clearly set forth what "objective standards" should be used to discern the "extraordinary and unusual" nature of an employee's work-related stress. In the absence of applicable Missouri case law, the Commission properly consulted case law in other jurisdictions to determine an objective standard for such stress.

Having considered the other cases cited by the Commission and case law regarding non-traumatic mental/mental claims from other jurisdictions, we are persuaded by the Iowa Supreme Court's analysis in *Dunlavey, supra.* In that case, the Iowa Supreme Court analyzed an employee's mental/mental claim under a state statute allowing compensation "for any and all personal injuries sustained by an employee arising out of and in the course of the employment." *Dunlavey,* 526 N.W.2d at 850 (emphasis and internal quotation marks omitted) (quoting Iowa Code Section 85.3(1) (1993)). The court first found the employee met his burden of proving, through medical testimony, that his diagnosed major depression was caused by the stresses he experienced at work. *Id.* at 853–54. Then the court, after analyzing case law from other jurisdictions, adopted the objective unusual stress standard enunciated by the Wyoming Supreme Court in *Graves, supra. Id.* at 855. The Iowa Supreme Court specifically concluded the employee must prove "that the mental injury was caused by workplace stress of greater magnitude than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs, regardless of their employer." *Id.* at 847, 858. Importantly, the Iowa Supreme Court noted that "[a]lthough evidence of workers with similar jobs employed by a different employer is relevant, evidence of the stresses of other workers employed by the same employer with the same or similar jobs will usually be most persuasive and determinative on the issue." *Id.* at 858.

The court in *Dunlavey* was addressing a state workers' compensation statute that did not expressly provide compensation for mental injuries arising out of work stress. Notably, the struggle to ascertain a proper comparison group of employees still exists when the statute specifically requires the stress to be extraordinary and unusual.

In Alaska a statute defines injury for purposes of workers' compensation as not including

mental injury caused by mental stress unless it is established that (A) the work stress was *extraordinary and unusual* in comparison to pressures and tensions experienced by individuals in a comparable work environment, and (B) the work was the predominant cause of the mental injury; the amount of work stress shall be measured by actual events; a mental injury is not considered to arise out of and in the course of employment if it results from a disciplinary action, work evaluation, job transfer, layoff, demotion, termination, or similar action, taken in good faith by the employer.

(emphasis added) Alaska Stat. Section 23.30.395(17) (1998). The Supreme Court of Alaska accepted the agency's interpretation of "individuals in a comparable work environment" as meaning other employees in claimant's office that had a position similar to that of claimant. *Williams v. State Dep't of Revenue,* 938 P.2d 1065, 1071 (Alaska 1997). Based on testimony of other employees in claimant's office that claimant was treated the same as other employees and that other similarly situated employees for the employer were under greater stress, the court found claimant

failed to establish her work stress[7] was extraordinary and unusual. *Id.* at 1072. Therefore, the court affirmed the denial of her mental injury claim. *Id.*

In contrast, the Maine Supreme Judicial Court has found the comparison should be to all employees. *Caron v. Maine Sch. Admin. Dist. No. 27,* 594 A.2d 560 (Me. 1991). The relevant Maine statute under consideration there stated:

> **Mental injury caused by mental stress.** Mental injury resulting from work-related stress does not arise out of and in the course of employment unless it is demonstrated by clear and convincing evidence that:
>
> **A.** The work stress was extraordinary and unusual in comparison to pressures and tensions experienced by the average employee; and
>
> **B.** The work stress, and not some other source of stress, was the predominant cause of the mental injury.
>
> The amount of work stress shall be measured by objective standards and actual events rather than any misperceptions by the employee. A mental injury is not considered to arise out of and in the course of employment if it results from any disciplinary action, work evaluation, job transfer, layoff, demotion, termination or any similar action, taken in good faith by the employer.

39 Me.Rev.Stat. Ann. Section 51(3)(1989), as quoted in *Caron,* 594 A.2d at 561–62 n. 1.[8] The court in *Caron* had to decide whether, under this provision, a mental/mental claimant "must demonstrate that she experienced work stress that was extraordinary and unusual in comparison to pressures experienced by the average of all employees or in comparison to pressures experienced by the average employ-

ee performing the same job with similar duties." *Caron,* 594 A.2d at 561. Finding the statute placed "no limitation or modification on the term 'average employee,'" the court determined the plain meaning of the statute required comparison of the work stress of the claimant with that experienced "by the average of all employees, rather than ... a specific class of employees." *Id.* at 562. The court further noted earlier case law in Maine had required claimant to establish a mental injury was caused by circumstances greater than the day-to-day stresses experienced by all employees, and the legislature did not clearly intend to modify that case law by this statutory provision. *Id.* at 562–63. Upon consideration of the record, the court affirmed an award of compensation for mental injury caused by pressures associated with claimant's position as a teacher in a program for gifted and talented children, and rejected an argument the injury resulted from the employer's good faith disciplinary action. *Id.* at 563.

■ We are persuaded that the proper comparison for purposes of Section 287.120.8 is to compare Employee's work-related stress with the stress encountered by employees having similar positions, regardless of employer, with a focus on evidence of the stress encountered by similarly situated employees for the same employer. *See Dunlavey, supra.* This standard allows consideration of the employment conditions of others in the industry when an employer is too small to have other similarly situated employees or when the stress levels of a particular employer are high. This also permits an employee to rely on evidence which is conceivably more readily available to the employee, evidence of the employee's em-

---

**7.** Claimant's employment in the Child Support Enforcement Division for the State of Alaska was reportedly stressful in that claimant was given five months in which to file paternity complaints in approximately 2,500 cases, there was no clerical support staff, there was an inadequate physical work environment, there was a "perceived lack of management support," and tension existed be-

tween her and her "new, less experienced, supervisor." *Williams,* 938 P.2d at 1067, 1068.

**8.** This statute is now codified at tit.39–A Me. Rev.Stat. Ann. Section 201(3) (West Cum. Supp.1998), with only minor change (the stress "must be," rather than "shall be," measured by objective standards).

ployer, if necessary to satisfy the employee's burden of proof.

■ Here, as the Commission pointed out, the only evidence regarding Employee's stress was her testimony of her own experience and Employer's Exhibit 2. Employee did not demonstrate the stress encountered by other hematologists within the stat lab either for this Employer or for any other employer. Employer's evidence, including Exhibit 2, shows Employee's work conditions were no greater than any one else in the same position in the stat lab of Employer. The available record does not establish Employee's stress was extraordinary and unusual when compared to other similarly situated employees of Employer or of any other employer. Point denied.

### Good Faith Action by Employer

■ In her second point, Employee contends the Commission's decision that Employer's actions toward Employee were taken in good faith is against the overwhelming weight of the evidence. Employer counters that consideration of the record under *Davis, supra,* demonstrates the decision was not against the overwhelming weight of the evidence.

Section 287.120.9 provides that:

A mental injury is not considered to arise out of and in the course of the employment if it resulted from any disciplinary action, work evaluation, job transfer, layoff, demotion, termination or any similar action taken in good faith by the employer.

The Commission decided the Missouri Supreme Court's determination that "[g]ood faith" requires "an honesty of intention" was applicable. *Blevins Asphalt Constr. Co. v. Director of Revenue,* 938 S.W.2d 899, 902 (Mo. banc 1997) (internal quotation marks omitted) (quoting *Conagra*

*Poultry Co. v. Director of Revenue,* 862 S.W.2d 915, 918 (Mo. banc 1993)).[9] Neither party contests this determination. Accordingly, we adopt that requirement for purposes of this appeal and leave to another case the decision whether that is enough under this statute. In light of our decision in *Wiele, supra,* which adopted the two-step analysis of *Davis, supra,* when the Commission reverses the ALJ's decision, we must consider the record in light of the *Davis* analysis.[10]

We first find a review of the record in the light most favorable to the award establishes there is substantial competent evidence to support the decision that Employer's actions were taken in good faith. There is evidence, from both Colonbini and Employee, supporting Employer's determination that Employee's inadequate record as a temporary section manager required the selection of someone else for the permanent section manager position. Moreover, there is substantial competent evidence that Employee had applied for the position Employer ultimately gave her in the stat lab and Employer provided her with additional training to help Employee with that position. The evidence of the varying schedule of employees in the stat lab reveals that Employee was not singled out to receive such a schedule. Finally, there is no indication the inability to give Employee a position a year after she left employment was a result of anything other than a need to fill a vacant position. Thus, there is substantial competent evidence to support the determination that Employer's conduct toward Employee reflects an "honesty of intention."

■ Once we find substantial competent evidence supporting the award, we consider all the evidence to ascertain whether the overwhelming weight of the

9. The Commission also referred to the definition of "bad faith" from *Black's Law Dictionary* 127 (5th Ed.1979) ("generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . ." (internal quotation marks omitted)).

10. Notably, both parties rely on *Davis* to address this point.

evidence is against the decision. *Davis,* 903 S.W.2d at 570. We must consider evidence contrary to the award, including the Commission's credibility determinations. *Id.* When the Commission's decisions "as to the credibility of witnesses who gave live testimony before the ALJ are different from those made by the ALJ, the ALJ's contrary findings must be given due consideration." *Id.* at 570–71.

Employee points to the ALJ's contrary credibility findings, as well as the evidence of her successful employment history with Employer prior to her appointment as temporary section manager, as support for her position that the overwhelming weight of the evidence is against the Commission's good faith determination. In particular, Employee quotes the following determination by the ALJ:

> The physically defeating floating schedule, which gave rise to medical treatment, was the last in a series of progressively adverse events created by Employer. The demotion of a typically overworked employee in and of itself was probably sufficient basis for the agitation and stress between Employer and [Employee] only because of its ethical dimension. But this event is reinforced by the subsequent imposition of terribly arduous hours which make a colorable claim of a bad faith demotion more clear and reveal a *pattern of mistreatment* sufficient to cause a mental injury. Employer's actions herein cannot be said to have been taken in "good faith," which term is taken in its plain meaning and context, under Missouri workers' compensation law, with regard to proof of "mental injury."

Employee contends this reflects the ALJ's credibility determinations regarding live witnesses which must be considered carefully in light of the Commission's conclusion there was not competent and substantial evidence to support the ALJ's determination that the personnel decisions were taken in bad faith.

The Commission's discussion of this issue contains a specific analysis of the available evidence:

> There is no evidence that the [Employee] was promised a permanent position as section man[a]ger. The [Employee] admitted that the assignment was temporary and that a permanent section manager was to be appointed within six months. The selection of a permanent section manager occurred slightly more than six months after the [Employee]'s promotion to the temporary position. There is no evidence that the individual chosen for the permanent position was unsuited for the job or was unqualified. Afterwards, the employer transferred the [Employee] to a position she had desired before the section manager position became available. The employer spent resources providing the [Employee] with additional training so that she could accept the stat lab position.
>
> ... [T]he [Employee] was unable to explain how her schedule in the stat lab varied from any of the other workers. Employer's Exhibit 2 ... indicates that none of the [Employee]'s "varied" hours required her to work past 8:00 p.m. or to begin work earlie[r] than 6:30 a.m. When the [Employee] worked the bridge shift, she did not have to report to work until 11:00 a.m.... The exhibit also verifies that other employees who performed similar work had similar work schedules. This is not a situation where the [Employee] was singled out or placed on morning shift one day and night shift another day.
>
> With respect to the [Employee]'s termination, she was off work approximately a year before she sought reinstatement to her job. There is no evidence that she had applied for and received appropriate leave for that extensive period of time or that she had a sufficient number of sick days to carry her through a year without working for [Employer]. It was a reasonable personnel decision for [Em-

ployer] to find a replacement worker under such circumstances.

Additionally, the Commission's explicit determination that Colonbini's testimony regarding the coagulation machines, rather than Employee's testimony regarding her involvement with those machines, was more credible is persuasive.

Our review of the record, including the ALJ's contrary findings, reveals the Commission's decision that Employer's conduct toward Employee was in good faith is not against the overwhelming weight of the evidence. Point denied.

### Medical Causation

■ Finally, in her third point, Employee urges the Commission's decision regarding Employee's failure to establish medical causation was against the overwhelming weight of the evidence.

■ Employee must show a causal connection between the injury and the job in order to recover compensation. *McGrath v. Satellite Sprinkler Sys., Inc.,* 877 S.W.2d 704, 708 (Mo.App. E.D.1994). "Medical causation, not within the common knowledge or experience, must be established by scientific or medical evidence showing the cause and effect relationship between the complained of condition and the asserted cause." *Id.* (internal quotation marks omitted) (quoting *Brundige v. Boehringer Ingelheim,* 812 S.W.2d 200, 202 (Mo.App. W.D.1991)). The Commission may determine what weight it will accord expert testimony on medical causation. *Landers v. Chrysler Corp.,* 963 S.W.2d 275, 282 (Mo.App. E.D.1997). "Where the right to compensation depends upon which [of] two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Id.*

Notably, the two doctors providing expert testimony in this case presented their testimony by deposition rather than as live witnesses before the ALJ. Their testimony regarding causation was clearly contradictory. Dr. Knowles, a psychiatrist and Employee's expert witness, opined Employee's failure to be promoted and subsequent dis-

covery, in March 1996, that she did not have a job were causes of her "major depressive illness, severe in nature, without psychotic features" and her "passive dependent type" "personality trait disorder." Dr. Wayne Stillings, a psychiatrist and Employer's expert witness, concluded Employee suffers from no psychiatric disorder and has no problems causally related to the conditions of her employment with Employer. He recognized that she exhibits "[p]aranoid personality traits" which are intrinsic to her personality. The parties also presented contradictory testimony of two vocational experts.

Under the circumstances we conclude the Commission's medical causation determination is not against the overwhelming weight of the evidence, even when considered in light of the non-medical evidence available of record. Point denied.

Judgment affirmed.

GARY M. GAERTNER, J. and RHODES RUSSELL, J., concur.