E.W., Respondent,

v.

**KANSAS CITY MISSOURI SCHOOL DISTRICT, Appellant,**

**Second Injury Fund, Respondent.**

**No. WD 60296.**

Missouri Court of Appeals,
Western District.

Sept. 3, 2002.

As Modified Nov. 26, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 26, 2002.

Charles R. Brown, Kansas City, MO, for appellant.

Dean L. Christianson, St. Louis, MO, for respondent E.W.

Anne E. Hawley, Assistant Attorney General, Kansas City, MO, for respondent Second Injury Fund.

Before BRECKENRIDGE, P.J., LOWENSTEIN and SMART, JJ.

PATRICIA BRECKENRIDGE, Judge.

The Kansas City Missouri School District appeals the Labor and Industrial Relations Commission's award of permanent

total disability benefits, temporary total disability benefits, past medical expenses, and future medical expenses to E.W., a high school teacher in the District. On appeal, the District argues that the Commission erred in finding that E.W. sustained a compensable psychiatric injury because she failed to prove that her injury was caused by extraordinary and unusual work-related stress. Additionally, the District argues that the Commission erred in holding it exclusively liable for E.W.'s psychiatric injury because E.W. had a history of mental difficulties without which she would not be permanently and totally disabled.

This court finds that E.W.'s claim was not for mental injury based upon work-related stress, so the statute requiring proof of extraordinary and unusual work-related stress did not apply. Therefore, the Commission did not err in concluding that E.W. sustained a compensable psychiatric injury, and that portion of the award is affirmed. This court further finds that the Commission's determination that the Second Injury Fund is not liable was a misapplication of the law and was against the weight of the evidence. The award of the Commission is, therefore, reversed, and the cause is remanded to the Commission to determine the amount of permanent partial disability benefits due E.W. from the District and permanent total disability benefits due E.W. from the Second Injury Fund and enter its award accordingly.

## Factual and Procedural Background

E.W. began working for the District in 1988. From 1988 to November 1996, E.W. held several positions within the District, including transition teacher, special needs transition teacher, mediator, and home school coordinator. For the 1996–97 school year, E.W. was assigned to teach math at Southeast High School.

On November 5, 1996, she was teaching an algebra class for approximately forty-five students when two boys in the class started arguing. The boys stood up and began walking toward the front of the class, threatening each other. When they reached E.W.'s desk, one of the boys picked up a three-hole punch from E.W.'s desk. The boys, ages seventeen and fourteen, then began to hit each other. E.W. instructed the rest of the students to move to the back of the room while she pushed an emergency call button to summon help from the front office. The boys continued to fight, knocking over chairs and smashing a fan into a wall. Since help had not arrived in response to the emergency call, E.W. asked one of the students in the class to go ask Coach Johnson, who had a walkie-talkie, to call for help. The student returned and told E.W. that Coach Johnson could not come to help. E.W. then sent another student to find administration and security.

As she waited for assistance from administration and security, E.W. went over to push the call button again. As E.W. turned around after pushing the call button, the boys, still fighting, slammed her into a bookshelf that was next to the wall. Her body hit the bookshelf, which was as tall as E.W.'s shoulders, and her head hit the wall behind the bookshelf. When the boys pinned E.W. against the bookshelf and were hitting her body with their bodies, she had flashbacks of sexual abuse she suffered as a child.

The boys fell off of her onto the floor and continued to fight. As they were rolling around on the floor, they rolled back into her and knocked the lower part of her body into the bookshelf. At that point, E.W. had an opportunity to kick the boys in the groin. She did not do so, however,

because she was afraid that the bigger of the two boys, a suspected gang member, was on drugs and might "go crazy" if she kicked him, and she was afraid that if she kicked the smaller of the two boys, he would be unable to defend himself against the bigger boy. The boys then got up and slid across her desk, knocking everything off of her desk. E.W. again pushed the emergency call button.

While the boys were on the floor on the other side of her desk, a female student in the class approached the boys with a pencil in her hand and held it over the boys as if she was going to stab them with it. E.W. grabbed her by the wrist and asked her what she was doing. The female student said she was going to stab the boys because they had damaged her purse during their fight. E.W. sent her out of the room.

As the female student left the room, another student came in and helped E.W. break up the fight. The two boys were removed from her classroom. E.W. worked the rest of the day, but was edgy and jumpy. That night, E.W. felt pain in her right leg and back, and she had a headache. She was also unable to sleep.

The next day, E.W. returned to work but was shaky and scared. She taught that day but did not teach the class in which the fight had occurred. E.W. was then reassigned to work in the front office of Southeast High School. E.W. worked for a week in the front office before she stopped working per her doctor's orders.

When E.W. asked for a referral to a doctor following the incident, the District sent her to the Business and Industry Health Group, where she received medical care and physical therapy for injuries to her neck and back. Also, because E.W. appeared weepy and upset and reported that she had not been able to sleep well since the incident, had nightmares, and was very concerned for her safety, the Business and Industry Health Group referred her to New Directions for psychological counseling.

During E.W.'s initial assessment at New Directions, her psychologist, Dr. Peter Cocolla, noted that after the November 5, 1996, incident, E.W. had symptoms of recurrent and intrusive distressing recollections of the incident; recurrent distressing dreams of the incident; flashback episodes; shaking and stomach pain when thinking about returning to the school; the desire to avoid returning to the classroom or the school building; diminished interest in teaching; difficulty falling asleep; irritability and anger; impaired concentration; exaggerated startle response; and chronic diarrhea. Dr. Cocolla diagnosed E.W. with acute stress disorder and recommended continued psychological counseling and a psychiatric evaluation.

The District referred E.W. to KU Medical Center for psychiatric evaluation and treatment. E.W. told psychiatrists at KU Medical Center that since the November 5, 1996, incident she felt anxious all of the time, was exhausted, had difficulty sleeping and eating, felt angry and frustrated, had chronic diarrhea, had recurrent distressing dreams of the incident and had shaking and stomach distress when she thought about returning to the classroom. The psychiatrists at KU Medical Center diagnosed E.W. with post-traumatic stress disorder and recommended that she be treated with antidepressant therapy and counseling. E.W. received medication and psychiatric treatment from KU Medical Center from December 1996 through April 13, 1999.

In addition to psychiatric treatment, E.W. received psychotherapy. In April 1997, the District referred E.W. to Dr. Garth Matthes, a psychologist. During their initial session, Dr. Matthes noted

that E.W. appeared anxious and seriously distressed, and exhibited symptoms of post-traumatic stress disorder. Dr. Matthes recommended that she not return to the school setting at that time and that she receive therapy for six months to one year. E.W. received counseling from Dr. Matthes until October 1997, when he withdrew from her case because he felt that the workers' compensation insurance carrier's antagonism was interfering with his ability to effectively treat E.W. Dr. Matthes did, however, strongly recommend that E.W. not return to work in the District or in any school setting until she receives further therapy to treat her post-traumatic stress disorder.

After Dr. Matthes withdrew from treating her, E.W. did not receive psychotherapy again until April 1998, when the District referred her to Dr. Stanley Butts, a psychologist. Dr. Butts diagnosed E.W. with post-traumatic stress disorder, major depression disorder, and panic disorder. E.W. received psychological counseling from Dr. Butts until July 31, 1998, when Dr. Butts withdrew from her case. E.W. did not feel that Dr. Butts was helping her. E.W. did not receive any further psychotherapy after Dr. Butts withdrew from her case.

On October 2, 1998, E.W. filed a claim for compensation with the Division of Workers' Compensation. In her claim, E.W. alleged that on November 5, 1996, while in the course and scope of her employment, she was slammed against a wall by two students who were fighting. She further alleged that the incident caused her to suffer injuries to her head, neck, back, arms, legs, and psychiatric condition. E.W. alleged that she was permanently and totally disabled as a result of the

November 5, 1996, accident. E.W.'s claim included a claim against the Second Injury Fund. Specifically, E.W. alleged that she had suffered injury to her psychiatric condition before November 5, 1996.[1]

In its answer to E.W.'s claim for compensation, the District admitted that E.W. was involved in an accident arising out of and in the course of her employment on November 5, 1996. The District denied, however, that all of the injuries E.W. alleged were the result of the November 5, 1996, accident.

At the hearing before the ALJ in April 2000, the parties stipulated that an accident arising out of and in the course of E.W.'s employment occurred on November 5, 1996. The disputed issues at the hearing were medical causation; liability for past and future medical care; the nature and extent of temporary total disability; the nature and extent of permanent disability; and the liability of the Second Injury Fund.

E.W. testified at the hearing that she currently suffers from frequent chest and abdominal pains, nausea, abdominal distress, sleeping problems, depression, and general anxiety. She said that 75% of her days are "bad days," in which she cannot even get out of bed to take her thirteen-year-old son to school, and she cannot stop crying. Being in crowds causes her to have panic attacks, so she avoids grocery stores, malls, schools, and new places. Additionally, E.W. testified that she has problems driving and being around children, and that reading and writing are challenging for her. E.W. testified that she does not feel at this time that she is able to work because it is a challenge for her just to get through the day. E.W. is currently

1. E.W.'s claim against the Second Injury Fund also asserted that she had suffered a prior physical injury. Since her physical injuries are not at issue in this appeal, this court will not discuss the prior physical injury.

taking Paxil for depression, Valium for anxiety, and Maxall and Thorazine for migraine headaches. E.W. was prescribed these medications by her current psychiatrist, Dr. Chester Day, who diagnosed her with post-traumatic stress disorder.

In addition to her testimony, E.W. offered the deposition testimony and report of Dr. Lyle Clark, a psychiatrist who conducted an independent psychiatric evaluation of E.W. at her attorney's request. Dr. Clark concluded that E.W. had symptoms consistent with recurrent major depressive disorder with chronic psychotic features, chronic post-traumatic stress disorder, and panic disorder with agoraphobia. In Dr. Clark's opinion, the incident of November 5, 1996, was a substantial factor in causing these conditions.

Dr. Clark acknowledged that prior to the November 5, 1996, incident, E.W. suffered from major depressive disorder and dyslexia, and had other stressors in her life. Nevertheless, he believed that her major depressive disorder appeared to be in full remission prior to the November 5, 1996, incident, she had no sign of psychosis before the incident and even with her dyslexia and other stressors, she was able to function successfully in her job. Dr. Clark opined that E.W. is 100% disabled from her psychiatric conditions. He attributed 85% of her disability to the November 5, 1996, incident and 15% to her pre-existing conditions. Dr. Clark believed E.W. would benefit from continuing to take medication for her conditions.

E.W. also offered the deposition testimony of Dr. Butts, one of the psychologists to whom the District had referred E.W. Dr. Butts testified that he had diagnosed E.W. with post-traumatic stress disorder, panic disorder, dysthymia disorder, and avoiden personality disorder. Dr. Butts opined that the November 5, 1996, incident "contributed substantially" to the post-trau-

matic stress disorder and the panic disorder. He was unsure whether the incident worsened the dysthymia disorder or affected the avoidant personality disorder. Dr. Butts believed that E.W. is 100% disabled from these conditions and will not be able to work in the foreseeable future. According to Dr. Butts, 15% of E.W.'s disability is attributable to the November 5, 1996, incident and 85% is attributable to pre-existing conditions.

E.W. also offered the deposition testimony and report of Timothy Lalk, a vocational rehabilitation counselor who evaluated E.W. in June 1999. Mr. Lalk determined that E.W.'s psychological symptoms and functional abilities preclude her from being able to secure and maintain employment in the open labor market. According to Mr. Lalk, "[t]he severity and frequency of her symptoms would preclude any employer from considering her for a position in which an individual was expected to be at work on specified days, work through a full workday, and maintain a rate of work output throughout that time." Mr. Lalk noted that before the November 5, 1996, incident, E.W. appeared to be quite successful in her employment with the District, as she had received many recommendations and accolades. In addition to this testimony, E.W. offered her medical records from all of the doctors from whom she had received medical, psychiatric, and psychological care either before or after the November 5, 1996, incident.

In response, the District offered the deposition testimony and report of Dr. G.R. Wurster, a psychiatrist who evaluated E.W. in February 1999 at the District's request. Dr. Wurster diagnosed E.W. with adjustment disorder with mixed anxiety and depressed mood; personality disorder not otherwise specified as manifested by passive dependent, passive aggressive, and paranoid traits; and

mild to moderate symptoms of anxiety and depression and moderate difficulty in current social and occupational functioning. Dr. Wurster testified that the November 5, 1996, incident was a substantial factor in causing her adjustment disorder, but that her personality disorder was a pre-existing condition that was only aggravated by the incident. Dr. Wurster believed her personality disorder was caused by the sexual and physical abuse she suffered over a ten-year period during her childhood. Dr. Wurster thought E.W. needed to continue with pharmacotherapy, and that 50% of her need for medication was due to the November 5, 1996, incident. Dr. Wurster opined that E.W. was 15% permanently partially disabled from the November 5, 1996, incident.

The District also offered the testimony of Dr. David Miller, a psychologist who evaluated E.W. in the fall of 1999. Dr. Miller opined that E.W.'s childhood abuse plays a significant role in the way she views the world emotionally. Dr. Miller did not think that E.W. was permanently and totally disabled, but he also did not believe that E.W. was intentionally malingering. Dr. Miller believed that E.W.'s emotional condition was getting worse because of the way the workers' compensation system is set up.

In addition to offering the opinions of Dr. Wurster and Dr. Miller, the District also offered the testimony of Sally Newell, the principal for the school where E.W. worked as a math transition teacher, a conflict mediator, and a home school coordinator during the 1995–96 school year. Ms. Newell testified that E.W. was a good worker, and she had no problems with E.W.'s work. E.W.'s supervisor when she was a home school coordinator during the second half of the 1995–96 school year, Walter McCreary, also testified on behalf of the District. Mr. McCreary testified that E.W.'s assignment as a home school coordinator was a promotion and that E.W. performed well in that position.

In its "Findings of Fact and Rulings of Law," the ALJ concluded that E.W.'s November 5, 1996, accident arose out of and in the course of her employment with the District and that E.W.'s mental injury was caused by that accident. The ALJ specifically stated that it found E.W. to be a "truthful and credible witness." The ALJ acknowledged that E.W. "may have had some pre-existing psychiatric problems, and these may have interfered with her ability to function from time to time." Nevertheless, the ALJ noted that "the consensus of opinion from the medical professionals was that the November 5, 1996 accident was a substantial factor in causing further, and disabling psychiatric injury." The ALJ concluded that the November 5, 1996, incident, "in and of itself, has caused [E.W.] to be unable to function in an employment setting." Therefore, the ALJ found the District solely responsible for past medical care, future medical care, temporary total disability benefits, and permanent total disability benefits.

The District appealed to the Commission. The Commission affirmed the ALJ's decision, with one member dissenting, and adopted the ALJ's findings and award. The District filed this appeal.

### Standard of Review

■ On appeal, this court will not disturb the Commission's award unless the Commission acted without or beyond its power, the award was procured by fraud, the facts found do not support the award, or the award is not supported by sufficient competent evidence in the record. Section

287.495.1, RSMo 2000.[2] To determine "whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it," this court uses a two-step process:

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis v. Research Med. Ctr.*, 903 S.W.2d 557, 571 (Mo.App.1995).

In reviewing the Commission's award, this court cannot substitute its judgment regarding questions of fact for that of the Commission. *Id.* Because, in this case, the Commission adopted the ALJ's findings and award, the "resulting consistency, especially as concerns credibility determinations, is a powerful factor in favor of upholding the Commission's award on appeal." *Id.* This court, however, is not bound by those findings of the Commission which are clearly the interpretation of application of law. *Id.* The claimant in a workers' compensation proceeding has the burden of proving all elements of the claim to a reasonable probability. *Ransburg v. Great Plains Drilling,* 22 S.W.3d 726, 730 (Mo.App.2000).

## Mental Injury Claim Not Based Upon Work–Related Stress

In its first point, the District argues that the Commission erred in finding that E.W. sustained a compensable mental injury. Under § 287.120.1, an employee is entitled to compensation for personal injuries that occur "by accident arising out of and in the course of his employment." An "accident" means "an unexpected or unforeseen identifiable event or series of events happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." Section 287.020.2. An "injury" is one "which has arisen out of and in the course of employment." Section 287.020.3(1). An injury arises out of and in the course of employment only where:

> (a) It is reasonably apparent, upon consideration of all the circumstances, that the employment is a substantial factor in causing the injury; and

> (b) It can be seen to have followed as a natural incident of the work; and

> (c) It can be fairly traced to the employment as a proximate cause; and

> (d) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life[.]

Section 287.020.3(2).

E.W.'s claim for compensation alleged that an accident arising out of and in the course of her employment occurred on November 5, 1996. Specifically, the accident occurred when she was slammed against a wall by two students who were fighting. In its answer to E.W.'s claim, the District admitted that E.W. was involved in an

---

**2.** All statutory references are to the Revised Statutes of Missouri 2000.

accident arising out of and in the course of her employment with the District on or about November 5, 1996. Thus, there was no dispute that the November 5, 1996, incident was an accident arising out of and in the course of E.W.'s employment with the District.[3] E.W. further alleged that the November 5, 1996, incident resulted in an injury to, *inter alia,* her psychiatric condition.

The District argues that E.W.'s mental injury was not compensable because she failed to meet the standard set in § 287.120.8 for mental injuries. Section 287.120.8 provides that "[m]ental injury resulting from work related stress does not arise out of and in the course of the employment, unless it is demonstrated that the stress is work related and was extraordinary and unusual. The amount of work stress shall be measured by objective standards and actual events." The District cites *Sherman v. First Financial Planners, Inc.,* a case from the Eastern District which holds that to meet the burden set in § 287.120.8, an employee "must compare her 'work-related stress with the stress encountered by employees having similar positions, regardless of employer, with a

focus on evidence of the stress encountered by similarly situated employees for the same employer.'" 41 S.W.3d 633, 637 (Mo.App.2001) (quoting *Williams v. De-Paul Health Ctr.,* 996 S.W.2d 619, 628 (Mo.App.1999)). The District argues that E.W. failed to present evidence of stress encountered by employees in similar positions with different employers, and she failed to present evidence of stress encountered by similarly-situated employees within the District. The District argues that the evidence showed that the conditions E.W. faced in her classroom were, in fact, commonplace.

The problem with the District's argument is that the plain language of § 287.120.8 indicates that it applies only to claims of "[m]ental injury resulting from work related *stress.*" (Emphasis added.) Indeed, *Sherman* and *Williams* were both cases in which the claimants' mental injury claims were based upon allegations that their working conditions over a period of time caused them to suffer stress. *See Sherman,* 41 S.W.3d at 636–37 (claimant alleged that her hours, duties, responsibilities and other work-related factors caused her stress);[4] *Williams,* 996 S.W.2d at 631

---

3. In the Commission's award, it stated that the District stipulated that E.W. "sustained injury by way of accident that arose out of and in the course of her employment." The District contends that the Commission's determination that the November 5, 1996, incident caused E.W.'s mental injury was, therefore, based in part upon the ALJ's erroneous finding that the District stipulated that the incident caused E.W.'s mental injury. This court does not interpret the reference to the stipulation that way, however. In referencing the stipulation, the ALJ and, subsequently, the Commission, were acknowledging that the District admitted in its answer that E.W. was involved in an accident that arose out of and in the course of her employment. The ALJ and the Commission were also acknowledging that the District stated in its answer that it "[d]enies that all the conditions alleged are

the result of said alleged accident," which indicates that the District admitted that *some* of her injuries were caused by the accident. Clearly, however, the ALJ considered the medical causation for E.W.'s alleged mental injury to be in dispute, as the ALJ stated at the hearing that medical causation was at issue in the case, most of the evidence presented at the hearing concerned medical causation of E.W.'s mental injury, and the evidence on this issue was discussed in detail in the award.

4. The claimant in *Sherman* also alleged that her injury arose from a specific event, which was a meeting with the president of the company during which the claimant's work was evaluated. 41 S.W.3d at 637. Under § 287.120.9, however, a mental injury resulting from a work evaluation is not considered to arise out of and in the course of employ-

(claimant alleged the conditions of her employment caused her stress). The court in *Williams* referred to such claims of mental injury based upon stress caused by work conditions as "non-traumatic mental/mental claims." *Id.* at 627. The *Williams* court undertook an examination of the case law from other jurisdictions regarding the requirement for proof of extraordinary and unusual work stress in non-traumatic mental/mental claims. *Id.* The cases discussed demonstrate that the reason for requiring proof of extraordinary and unusual work stress was the legislature's intention to limit workers' compensation benefits to mental injuries caused by circumstances other than ordinary day-to-day mental stresses experienced by all employees. *See id.* at 627–28. The need to distinguish extraordinary mental stress from ordinary day-to-day stress is not applicable to a mental injury arising from a traumatic event, so it is understandable why the legislature did not require proof of extraordinary and unusual stress for compensation of a claim for mental injury resulting from a traumatic incident.

■ Here, E.W.'s claim of mental injury was not based upon work-related stress but, instead, was based upon the incident that occurred in her classroom on November 5, 1996. Although evidence was presented concerning the stress E.W. encountered in her job prior to the classroom incident, E.W.'s claim for compensation against the District specifically alleged that her mental injury resulted when, on November 5, 1996, she "was slammed against a wall by two students who were fighting." E.W.'s claim was for mental injury resulting from a particular traumatic event, not from work-related stress. By its terms, therefore, the provisions of § 287.120.8 do not apply to E.W.'s claim, and she was not required to present evidence that stress from teaching conditions such as the fight that occurred on November 5, 1996, was extraordinary and unusual.[5] Therefore, the Commission did not err in finding that E.W. suffered a compensable mental injury. The District's first point is denied.

### Last Accident Not Sole Cause of Permanent Total Disability

■ In its second and third points, the District challenges the Commission's award wherein it determined that the District is exclusively liable for permanent total disability benefits. In its second point, the District claims the award was not supported by substantial evidence and was against the weight of the evidence. The District further argues in its third point that the award was a misapplication of the law governing the apportionment of liability to the Second Injury Fund. The District contends that E.W. "had a long history of mental difficulties" without which she would not be permanently and totally disabled, and which combined with her injuries from the November 5, 1996, incident to produce E.W.'s permanent and total disability. Therefore, the District ar-

---

ment, so any alleged injury resulting from that specific event was not compensable on that basis. *Id.* at 637.

5. In discussing whether a mental injury that occurred after a slip-and-fall accident arose out of and in the course of employment, this court, in *Bloss v. Plastic Enters.,* 32 S.W.3d 666, 672 (Mo.App.2000), referred to the standard for mental injury based upon work-related stress provided for in § 287.120.8 and discussed in *Williams,* 996 S.W.2d at 627. This portion of *Bloss* is dicta, however, since this court did not apply the § 287.120.8 standard in determining whether claimant's mental injury arose out of and in the course of employment but, rather, looked at whether the slip-and-fall accident caused the claimant's mental injury. *Bloss,* 32 S.W.3d at 672–73.

gues that the Commission should have apportioned some liability to the Second Injury Fund.

The Second Injury Fund contends that any pre-existing injuries E.W. may have had did not interfere with her ability to find employment or to perform the duties of her job. The Second Injury Fund notes that prior to the classroom incident, E.W. had never had panic attacks or startled responses, nor had she had anxiety problems being in crowds and public places, going to grocery stores and schools, driving, being around children, writing reports, or making presentations. Additionally, there was evidence that she performed well in her jobs with the District and received accolades and promotions.

In its award, however, the Commission found that, on October 1, 1996, just five weeks before the incident, E.W. complained of severe stress at school, which caused her nausea, abdominal pain, and diarrhea. As the Commission noted, at that time, E.W. was considering quitting her job. Seven days before the incident, she sought treatment from a gastroenterologist for her continuing physical complaints due to stress.

In its conclusions of law, the Commission acknowledged that E.W. "may have had some pre-existing psychiatric problems, and these may have interfered with her ability to function from time to time." Nevertheless, the Commission concluded that "this does not take away from the fact that the accident of November 5, 1996, in and of itself, has caused [E.W.] to be unable to function in an employment setting." In so holding, the Commission did not apply the correct legal standard for determining whether a pre-existing condition triggers the liability of the Second Injury Fund.

■■■ To trigger the liability of the Second Injury Fund, an employee must have a pre-existing permanent partial disability, whether from a compensable injury or otherwise. Section 287.220.1; *Karoutzos v. Treasurer of State*, 55 S.W.3d 493, 498 (Mo.App.2001). "The permanent disability pre-dating the injury in question must 'exist at the time the work-related injury was sustained and be of such seriousness as to constitute a hindrance or obstacle to employment or re-employment should the employee become unemployed.'" *Id.* (quoting *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 214 (Mo.App. 1999)). *See also* 287.220.1. To determine whether a pre-existing partial disability constitutes a hindrance or obstacle to the employee's employment, "the Commission should focus on the potential that the pre-existing injury may combine with a future work related injury to result in a greater degree of disability than would have resulted if there was no such prior condition." *Carlson v. Plant Farm*, 952 S.W.2d 369, 373 (Mo.App.1997). Liability of the Second Injury Fund is triggered only "by a finding of the presence of an actual and measurable disability at the time the work injury is sustained." *Messex*, 989 S.W.2d at 215.

■■■ The Commission concluded that "the accident of November 5, 1996, in and of itself, has caused [E.W.] to be unable to function in an employment setting." A finding of causation must be supported by medical testimony, however. *Elliott v. Kansas City, Mo., Sch. Dist.*, 71 S.W.3d 652, 658 (Mo.App.2002). Without medical testimony, any finding of causation "'would be based on mere conjecture and speculation and not on substantial evidence.'" *Id.* (citations omitted). While the evidence in this case supports a finding that the November 5, 1996, incident was a *substantial factor* in causing E.W.'s permanent total disability, a finding that the November 5, 1996, incident was the *sole*

*cause* of E.W.'s permanent total disability is against the weight of the evidence.

Indeed, all of the doctors who evaluated E.W. for the hearing attributed part of her current condition to her pre-existing psychiatric injury. As the Commission noted in its findings of fact, Dr. Miller, who did not believe that the November 5, 1996, incident was a substantial factor in causing her current condition, opined that "[t]he physical and sexual abuse [E.W.] suffered as a child plays a significant role in the way she views the world emotionally." Similarly, Dr. Wurster, who did believe that the November 5, 1996, incident was a substantial factor in causing E.W.'s current condition, opined that E.W. suffered from a pre-existing personality disorder caused by the childhood physical and sexual abuse. According to Dr. Wurster, this abuse "has affected her every day life prior, during, and since the incident of November 5, 1996."

Drs. Butts and Clark went even further than Drs. Miller and Wurster and assigned actual percentages of E.W.'s current condition to her pre-existing psychiatric injury. Dr. Butts, who diagnosed E.W. with depression, post-traumatic stress disorder, and panic disorder, attributed 85% of her 100% disability to her pre-existing injury. Dr. Clark diagnosed E.W. with major depressive disorder, post-traumatic stress disorder, and panic disorder with agoraphobia. Dr. Clark opined that before the November 5, 1996, incident, E.W. suffered from major depressive disorder, but it "appeared to be in full remission prior to the incident of November 5, 1996." Nevertheless, Dr. Clark attributed 15% of her 100% disability to her pre-existing major depressive disorder.

No doctor in this case testified that the November 5, 1996, incident was the sole cause of E.W.'s current condition. Even Drs. Wurster, Butts, and Clark, those doctors upon whom the Commission relied to support its conclusion that the classroom incident was a substantial factor in causing E.W.'s permanent total disability, did not testify that the classroom incident was sufficient, in and of itself, to cause E.W.'s permanent total disability.

As this court stated in *Carlson*, in deciding whether a pre-existing injury constitutes a hindrance or obstacle to employment or reemployment, the focus is "on the potential that the pre-existing injury may combine with a future work related injury to result in a greater degree of disability than would have resulted if there was no such prior condition." 952 S.W.2d at 373. The only clear consensus among all of the medical evidence presented was that E.W.'s pre-existing psychiatric injury combined with the November 5, 1996, injury to result in a greater degree of disability than would have resulted if she had not had the prior injury. Moreover, Dr. Butts and Dr. Clark opined that E.W.'s pre-existing injury was a form of depression and, although they disagreed on the percentage, both doctors were able to measure the degree of E.W.'s pre-existing injury. Their testimony established that E.W. had an actual and measurable disability at the time she sustained her work injury, which is what is necessary to trigger Second Injury Fund liability. *Messex*, 989 S.W.2d at 215.

One of the purposes of the Second Injury Fund is "to relieve an employer or his insurer of liability for the previously disabled employee's total and permanent disability where that disability is not specifically attributable to an injury suffered during the period of employment with that employer." *Loven v. Greene County*, 63 S.W.3d 278, 282 (Mo.App.2001). Here, the weight of the evidence established that a portion of E.W.'s permanent disability cannot be specifically attributed to the No-

vember 5, 1996, classroom incident and is, instead, attributable to her pre-existing psychiatric injury.

The Commission's conclusion that the November 5, 1996, classroom incident was the sole cause of E.W.'s permanent total disability was a misapplication of the law and was against the weight of the evidence. Therefore, the award is reversed, and the cause is remanded to the Commission. On remand, the Commission is directed to determine the amount of permanent partial disability benefits due E.W. from the District and permanent total disability benefits due E.W. from the Second Injury Fund and enter its award accordingly. Section 287.220.1.

All concur.