Linda L. CARLSON, Appellant,

v.

PLANT FARM, Defendant,

Treasurer of the State of Missouri, Custodian of the Second Injury Fund, Respondent.

No. WD 53196.

Missouri Court of Appeals, Western District.

Sept. 23, 1997.

Steven A. Fritz, Sedalia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen M. Speiser, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and HOWARD, JJ.

ELLIS, Presiding Judge.

On April 12, 1991, while employed by The Plant Farm in Sedalia, Missouri, Linda Carlson slipped and fell on a wet ramp injuring her low back. Carlson filed a workers' compensation claim against her employer and the Second Injury Fund (SIF). She subsequently settled her claim against The Plant Farm based on a 10% permanent partial disability rating. However, she continued to pursue her claim against the SIF, alleging she was permanently, totally disabled due to the combination of her work-related low back injury and pre-existing psychological conditions, including agoraphobia and panic attacks. The Administrative Law Judge (ALJ) found Carlson was permanently and totally disabled by this combination. The SIF appealed to the Labor and Industrial Relations Commission (the Commission), which reversed the ALJ's award, finding that Carlson was capable of maintaining employment despite her alleged pre-existing psychological disability. Carlson appeals from the Commission's decision.

The record reveals that Carlson was originally diagnosed as suffering from agoraphobia, panic attacks, and depression in 1981. She is unable to predict when one of these attacks will occur, however at the onset of an attack, her heart begins to beat very rapidly, she begins to sweat, she feels very shaky, her legs get rubbery, and she is overcome by an impending fear that if she cannot get to a safe place she may die of a heart attack. An attack may last only a few minutes, or an entire day. Carlson was hospitalized for treatment of these symptoms in 1981 and 1989. In an effort to control her attacks, Carlson has taken a host of prescription medications and has participated in group and individual therapy with psychologists and counselors.

Since Carlson was first diagnosed in 1981, she has held numerous jobs, most of which were sales positions. She worked as a cocktail waitress in 1981, but quit because she did not like the job. From 1983 to 1984, she worked at an electronics and appliance store as a salesperson and occasional bookkeeper, until the store went out of business. Between 1984 and 1986, Carlson worked as a temporary salesperson for two different clothing stores during their going-out-of-business sales. From 1986 to 1987, she worked behind the counter in the video rental department at an electronics store. By the time the store closed in 1989, she had been promoted to a floor salesperson in its audio and video department and was performing some bookkeeping duties. Thereafter, Carlson worked as a supervisor at a clothing store, but quit in June of 1990 to stay home with her children when the school year ended.

In January of 1991, Carlson began working at The Plant Farm. Her job included nurturing and transplanting plants, loading and unloading the delivery truck, and making deliveries. On April 12, 1991, while at work, Carlson slipped and fell on a wet ramp injuring her low back.

Following the accident, Carlson saw Dr. Sher, a neurosurgeon, who determined that Carlson had suffered cervical and lumbar strains and told her the she could no longer do "that kind of work anymore." Carlson voluntarily quit her job based on this advice.

On January 15, 1992, Carlson saw Dr. Jane Vale at the Columbia Orthopaedic Group. X-rays taken by Dr. Vale revealed only mild thoracic spondylosis and were otherwise negative. According to Dr. Vale, Carlson did not have a condition requiring surgery. Carlson was treated with prescription medications, physical therapy, and rest. Her symptoms improved as a result of her physical therapy.

Following an office visit on March 24, 1992, Dr. Vale released Carlson to work with restrictions. On April 14, 1992, Dr. Vale made the following notes regarding Carlson's condition:

... She indicates that she is markedly improved since last being seen. She has benefited significantly from additional exercise and conditioning.... Patient indicates she has markedly increased activity at home. She is doing Spring cleaning. She at times has to do things slower than she had previously though otherwise is doing very well. She has also been contacted by her previous employer and will be returning to day care this summer on

an as needed basis. She is very excited about this. She also plans to initiate school in the fall and will be pursuing social services degree. She states she can either teach, do social services, or work in child care. Patient indicates that she is now having much more infrequent pain and is much better able to control her pain. She is in general resting well.

\* \* \*

Patient presents to clinic with extremely positive affect and mood. She very readily changes position. She is noted to walk without limp and is able to toe and heel walk without motor weakness. She has markedly improved posture. Examination reveals no point tenderness of the cervical, thoracic, or lumbar sacral bony structures. Mild tenderness of the toe palpation is present of the thoracic intrascaplar soft tissue and of the SI joints. Patient has good range of motion of the cervical and lumbar spine and of the scapula ...

\* \* \*

Examination of the upper and lower extremities reveals negative straight leg raising. Full range of motion of the joints. Dr. Vale further opined that Carlson had suffered a 7% permanent partial impairment of the total body, and had "essentially reached maximum medical improvement and is knowledgeable in appropriate self-care."

In July of 1992, Carlson obtained a position as a cashier for Casey's General Store, but quit after working only four hours because she "wanted to stay home." From August to December of 1993, Carlson worked at a daycare center. However, she quit because "there was a lot of lifting with babies," it was stressful, and she was afraid that when she had a panic attack, she would be unable to take care of the children.

From 1993 until her hearing before the ALJ on September 19, 1995, Carlson received no medical treatment for her back. Carlson admitted that she was still able to do household chores, including laundry, dusting, and vacuuming.

Carlson first filed her claim for disability benefits with the Division of Workers' Compensation on May 24, 1991.[1] Following a hearing on September 19, 1995, the ALJ found that Carlson sustained a 15% permanent partial disability resulting from her work-related injury. The ALJ further determined that the resulting combination of Carlson's pre-existing condition and work-related injury rendered her permanently and totally disabled. On appeal, the Commission reversed the ALJ's award. Carlson appeals the Commission's decision.

Our standard of review is set forth in *Davis v. Research Medical Center*, 903 S.W.2d 557 (Mo.App. W.D.1995):

The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings. Findings and awards of the Commission which are clearly the interpretation or application of the law, as

1. Carlson subsequently amended her claim on two occasions.

distinguished from a determination of facts, are not binding on the court and fall within the court's province of independent review and correction where erroneous. And, where the findings of ultimate fact are reached not by a process of natural reasoning from the facts alone, but rather by application of law, it is a conclusion of law and subject to reversal by the court. *Id.* at 571. In the first step under the *Davis* standard, the court disregards "any evidence which might support any finding different from those made by the Commission." *Id.* at 566.

■ In her first point on appeal, Carlson contends the Commission's award is not supported by sufficient competent and substantial evidence, and that it is against the overwhelming weight of the evidence. We disagree.

■ To be entitled to Second Injury Fund benefits under § 287.220, a claimant must have a permanent "previous disability." *Leutzinger v. Treasurer of Missouri*, 895 S.W.2d 591, 592 (Mo.App. E.D.1995).[2] The previous disability need only be a "hinderance or obstacle to employment or obtaining employment." *Id.;* § 287.220.1. In determining whether a pre-existing disability constitutes a hinderance or obstacle to the employee's employability, the Commission should focus on the potential that the pre-existing injury may combine with a future work related injury to result in a greater degree of disability than would have resulted if there was no such prior condition. *Garibay v. Treasurer of Missouri*, 930 S.W.2d 57, 60 (Mo.App. E.D.1996). Any pre-existing injury which could be considered a hinderance to an employee's competition for employment in the open labor market should trigger Second Injury Fund liability. *Leutzinger,* 895 S.W.2d at 593.

■ Carlson claims that her pre-existing psychological condition in combination with her low back injury, rendered her totally and permanently disabled. Total disability means the inability to return to any employment, not merely the employment in which the employee was engaged at the time of the work-related injury. § 287.020.7. The pertinent consideration in determining whether an employee is totally disabled is whether any employer in the usual course of business would reasonably be expected to employ the employee in her present physical condition. *Isacc v. Atlas Plastic Corp.*, 793 S.W.2d 165, 166 (Mo.App. E.D.1990).

Since Carlson was diagnosed with agoraphobia and panic attacks in 1981, she has been employed in a variety of jobs, the majority of which were retail positions involving substantial interaction with the public. Despite her psychological condition, on more than one occasion, she was promoted or assigned additional tasks due to her competence. However, for personal reasons unrelated to her condition, she quit each of these jobs. She was never fired or reprimanded due to her psychological condition.

■ The record is noticeably devoid of any expert testimony establishing the extent of Carlson's pre-existing disability at the time of the accident, even though the Commission must determine the degree or percentage of the employee's disability that is attributable solely to the pre-existing condition at the time of the last injury in order to compute the total disability compensation to which an employee is entitled from the Second Injury Fund. *Frazier v. Treasurer of Missouri*, 869 S.W.2d 152, 155 (Mo.App. E.D.1993); § 287.220.

2. When Carlson sustained injury to her low back in 1991, § 287.220 provided for an award of Second Injury Fund where the pre-existing injury was industrially disabling and combined with the primary injury to result in a greater disability than the primary injury caused alone. § 287.220, RSMo 1990. Following the legislative amendment of § 287.220 in 1993, however, the pre-existing condition need only be of such seriousness as to constitute a hinderance or obstacle to employment or to obtaining re-employment if the employee were to become unemployed. § 287.220, RSMo 1993. Pursuant to the holding in *Leutzinger v. Treasurer of Missouri,* and its progeny, the "hinderance or obstacle" standard is to be applied retroactively. *Leutzinger v. Treasurer of Missouri,* 895 S.W.2d 591, 594 (Mo.App. E.D.1995). Accordingly, Carlson's pre-existing disability must be determined pursuant this standard. *Garibay v. Treasurer of Missouri,* 930 S.W.2d 57, 61 (Mo.App. E.D.1996).

Similarly, the record contains very little evidence establishing the severity of the injury to Carlson's low back. The injury required no surgery, and was treated solely with medication, therapy and rest. Just one year after the injury, Carlson admitted that she noticed a marked improvement in her mobility, that she had increased activity at home, including Spring cleaning, and that her pain was more infrequent and controllable. Thereafter, she was released by Dr. Vale with a 7 percent permanent partial impairment and no permanent work restrictions. Carlson received no medical attention for her back from 1993 to the date of the hearing in 1995.

Carlson argues that the Commission improperly rejected the opinions and testimony of Dr. John T. Bopp, Ph.D., a psychologist and vocational expert, and Mr. Russell Wood, a psychologist, who testified on her behalf. Despite the ALJ's reliance on Dr. Bopp's testimony, the Commission rejected it, finding it to be unbelievable and not credible. The ALJ's credibility determinations are not binding on the Commission, and we review the Commission's award, not the findings of the ALJ. *Davis*, 903 S.W.2d at 574. However, in reviewing the Commission's credibility determination of a witness who testified live before the ALJ, we must consider the ALJ's credibility findings, as well as the reasons, if any are given, why the Commission reached a different credibility determination. *Id.*

Dr. Bopp evaluated Carlson on November 18, 1994, nearly four and a half years after the work-related injury. In his report, he did not initially render an opinion as to Carlson's disability resulting from the combination of her psychological and physical conditions. At the behest of Carlson's attorney, Dr. Bopp subsequently amended the report to include his determination that the interaction of Carlson's 10% permanent partial disability from the injury and 75 percent disability from her pre-existing condition "resulted in a total permanent disability."

Dr. Bopp testified live before the ALJ regarding this amendment. According to Dr. Bopp, given the nature of Carlson's psychological condition, she could not function effectively in sales positions, and given her physical limitations, it would be difficult for her to work in unskilled positions. Dr. Bopp testified that Carlson "doesn't have the ability to function in the semi-skilled areas that she developed given her psychological condition ... [s]he can't use her skills, and she would have a difficult time functioning physiologically to work in the unskilled labor market." He went on to testify that Carlson's psychological condition precludes her from functioning in any job because she could not do the job duties.

The Commission rejected Dr. Bopp's opinion that Carlson was totally and permanently disabled because it believed his opinion was based on several incorrect factual assumptions. By Dr. Bopp's own admission, he based his opinion in large part on the vocational, medical, and educational histories Carlson provided him at the evaluation. On cross-examination, he conceded that the work-related restrictions he took into account in reaching his opinion were self-imposed by Carlson and were not actual restrictions imposed by Dr. Vale.

Dr. Bopp also testified that he took into account Carlson's complaint that she has a difficult time interacting with people and was forced to quit her jobs because they were too stressful. The evidence indicates, however, that the majority of jobs held by Carlson since 1981 involved retail sales and required a significant amount of interaction with the public; that she had never been terminated by an employer because she was unable to perform the requirements of the job; and that she had voluntarily quit her previous jobs for personal reasons.

Finally, the Commission expressed concern over Dr. Bopp's lack of consistency in the nomenclature used to describe Carlson's condition. Specifically, the Commission was disturbed by his vacillation between the terms "impairment" and "disability," indicating that he may not possess a thorough understanding of the term "permanent total disability." Dr. Bopp opined that Carlson suffered a 75 percent "impairment" from her mental condition; he never referred to her mental condition as a "disability" or as being permanent.

Having reviewed the record, we think it is clear the Commission did not "callously ignore, capriciously reject, or arbitrarily disregard" the ALJ's credibility determination with respect to Dr. Bopp, but rather carefully considered but ultimately rejected such finding, reaching its own independent conclusion that Dr. Bopp lacked credibility. *Davis,* 903 S.W.2d at 574. We cannot say the Commission's reasoning in doing so is specious or injudicious. To the contrary, the Commission's explanation as to its credibility call with regard to Dr. Bopp is considered and rational, and amply supported by the record.

In reaching its decision, the Commission also differed with the ALJ's credibility determination regarding Mr. Wood. The Commission discounted Mr. Wood's testimony, which was presented entirely by deposition. Because Mr. Wood did not provide live testimony before the ALJ, the Commission was in a position to determine his credibility from the record equally as well as the ALJ. *Id.* at 573. Therefore, we defer to the Commission's credibility determination regarding Mr. Wood and disregard that of the ALJ. *Id.* Thus, to the extent Carlson asks this court to re-weigh the credibility of this witness, we decline to do so.

Mr. Wood evaluated Carlson on April 13, 1994, on behalf of the State disability office. In evaluating Carlson, the State specifically requested that he not render an opinion regarding her employability. Nonetheless, at the hearing, Carlson's counsel asked Wood to render an opinion regarding whether Carlson's psychological condition created a hinderance or an obstacle to her employment. In response, Wood stated that, " 'generally speaking' Carlson's diagnosis creates a possibility of affecting a person's ability to work depending on the severity of the illness and type of the job." Assuming this was sufficient to satisfy the "hinderance or obstacle to employment or obtaining employment" requirement for entitlement to Second Injury Fund benefits, it is wholly insufficient to establish permanent total disability, which was the claim made by Carlson. It must be

remembered that Carlson neither pleaded nor presented any evidence on enhanced permanent partial disability. Her claim was predicated entirely on permanent total disability resulting from the combination of her work-related low back injury and pre-existing psychological condition.

Based on our review of the whole record, including and taking account of the Commission's credibility determinations, it is apparent the award is supported by sufficient competent and substantial evidence, and that it is not against the overwhelming weight of the evidence. Point denied.

Carlson nevertheless complains that the Commission erroneously concluded that she was not totally and permanently disabled. She contends that despite the evidence that "she was able to work without difficulty in the past," the overwhelming weight of the evidence supports a finding that her pre-existing disability, in combination with her work-related injury, would prevent any reasonable employer from hiring her.

In an effort to demonstrate her unemployability, Carlson adduced the following evidence: (1) she was previously institutionalized and counseled for her condition, (2) that "the stress of the job" forced her to take unexplained absences and quit various jobs, (3) she obtained employment at Casey's General Store and a day care center after her low-back injury, but had to quit because she was unable to handle the physical requirements and the stress of these jobs, (4) she attempted to attend college, but found it too overwhelming, and (5) medical testimony that she was incapable of working.

Dr. Bopp presented the only evidence that the low back injury and pre-existing condition combined so that Carlson was totally and permanently disabled. The Commission is free to accept or reject any evidence, and did so upon sound reasoning.[3] *Lytle v. T–Mac, Inc.,* 931 S.W.2d 496, 501 (Mo.App. W.D.1996). Thus, Carlson's own testimony that her combined conditions ren-

---

**3.** The parties have not raised the issue of whether a psychologist is qualified to render an opinion on medical questions when the disability involves a psychological condition. We need not

and do not decide the issue. However, we do note that "the Commission is free to accept or reject medical evidence." *Lytle v. T–Mac, Inc.,* 931 S.W.2d 496, 501 (Mo.App. W.D.1996).

der her incapable of maintaining employment is all that remains in support of her claim that she is disabled. The Commission is charged with weighing the evidence and resolving any conflicts that may arise. *Hatter v. Cleaning Serv. Co.*, 814 S.W.2d 951, 955 (Mo.App. W.D.1991). The Commission obviously rejected Carlson's testimony on this issue, and indeed found other parts of her testimony supported a finding that she was not totally and permanently disabled. Given the deference we must accord the Commission's findings of fact and determinations of credibility, Carlson's point is devoid of merit. Point denied.

Finally, Carlson contends the Commission misinterpreted and misapplied the law. She asserts the Commission evaluated her pre-existing condition on the basis of whether it "substantially impaired" her ability to work as was appropriate prior to the amendment of § 287.220.1 in 1993. She stresses that the issue now is whether the pre-existing disability constitutes a "hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed...." § 287.220.1. Carlson's argument misses the mark.

Carlson presented no medical evidence to support her claim. Her evidence consisted of her own testimony and that of Dr. Bopp and Mr. Wood. The Commission found Dr. Bopp's testimony lacking in credibility, as well as much of Carlson's testimony. It likewise found that Mr. Wood's testimony was insufficient to establish permanent total disability. Finally, the Commission noted there was no evidence to support an enhanced permanent partial disability finding because there was nothing in the record from which it could be determined what degree of psychological disability Carlson allegedly suffered at the time of her 1991 work accident, such that a judgment could be made that the two disabilities created a disability greater than the simple sum. In other words, Carlson's claim was predicated upon her being permanently and totally disabled. The Commission found that she failed to present sufficient competent and substantial evidence to support such a finding. While she might have been able to adduce evidence to support an enhanced permanent partial disability award, she did not do so. The Commission neither misinterpreted nor misapplied the law. Point denied.

The award of the Commission denying compensation is affirmed.

All concur.