**Alfred Leon LORENTZ, Jr., Respondent,**

v.

**MISSOURI STATE TREASURER, as custodian of the Second Injury Fund, Appellant.**

No. 24308.

Missouri Court of Appeals, Southern District, Division One.

April 25, 2002.

Jeremiah W. (Jay) Nixon, Attorney General, and Deborah A. Ledgerwood, Assistant Attorney General, Jefferson City, for appellant.

Lindell P. Dunivan, Farmington, for respondent.

ROBERT S. BARNEY, Chief Judge.

Alfred Leon Lorentz, Jr., ("Claimant") was injured on March 21, 1996, while working as an underground mining prospector for Doe Run Company ("Doe Run"). A piece of equipment weighing in excess of 800 pounds fell on him accidentally while he was drilling holes into rock to extract rock samples in an underground mine. He injured his ribs and low back. Claimant filed a claim against both Doe Run and the Missouri Second Injury Fund ("the Fund"). Doe Run and its insurer settled with Claimant for his claim based on 25 percent permanent partial disability of the body as a whole or 100 weeks. An Administrative Law Judge ("ALJ") found Claimant to be permanently and totally disabled as a result of the primary injury of March 21, 1996, but found the Fund was not liable for any pre-existing disability. The Labor and Industrial Relations Commission ("the Commission") agreed that Claimant was permanently and totally disabled, but ruled that it was due to a combination of his primary injury and pre-existing disabilities and reversed the decision of the ALJ which found no liability on the part of the Fund. The Commission then awarded Claimant weekly benefits for the rest of his life, or as modified by law, payable by the Fund.

In its sole point on appeal, the Fund contends the Commission erred in finding the Fund liable for permanent total benefits because the facts did not support the Commission's award. It argues that the overwhelming weight of the evidence supports a finding that if Claimant is perma-

nently and totally disabled it is due to the 1996 injury alone.

▪ Review is essentially a two-step process as described in *Davis v. Research Med. Ctr.*, 903 S.W.2d 557, 570 (Mo.App. 1995). We must first determine whether the whole record, viewed in the light most favorable to the award of the Commission, contains sufficient competent and substantial evidence to support the Commission's award. *Kizior v. Trans World Airlines*, 5 S.W.3d 195, 199 (Mo.App.1999). If we find that it does, then we make a determination as to whether the award is against the overwhelming weight of the evidence. *Id.* In this second step, all of the evidence in the record is considered, including that unfavorable to the decision of the Commission. *Id.* "We defer to the Commission on issues encompassing the credibility of witnesses and the weight given to the testimony." *Id.* "Conflicts in the evidence are to be resolved by the Commission." *Searcy v. McDonnell Douglas Aircraft Co.*, 894 S.W.2d 173, 178 (Mo.App.1995). We independently review questions of law. "As always, the criteria should be applied liberally in favor of compensating the [Claimant]." *Leutzinger v. Treasurer*, 895 S.W.2d 591, 593 (Mo.App.1995).

For Second Injury Fund liability, a preexisting disability must combine with a disability from a subsequent injury in one of two ways: (1) the two disabilities combined result in a greater overall disability than that which would have resulted from the new injury alone and of itself; or (2) the preexisting disability combined with the disability from the subsequent injury to create permanent total disability.

*Reese v. Gary & Roger Link, Inc.*, 5 S.W.3d 522, 526 (Mo.App.1999); *see* § 287.220.1.[1] "Under this section, for either condition, the employer is liable only for that disability attributable to or resulting from the last injury." *Stewart v. Johnson*, 398 S.W.2d 850, 853 (Mo.1966).

▪ Given the factual scenario in the instant matter and the findings by the Commission that Claimant was permanently and totally disabled, "[i]t is with the second of these conditions that we are concerned." *Id; see Leutzinger*, 895 S.W.2d at 594; § 287.220.1.[2]

That portion of section 287.220.1 pertaining to permanent total disability reads, in pertinent part, as follows:

If the previous disability or disabilities, whether from compensable injury or otherwise, and the last injury together result in total and permanent disability, the minimum standards under this subsection for a body as a whole injury or a major extremity injury shall not apply and the employer at the time of the last injury shall be liable only for the disability resulting from the last injury considered alone and of itself; except that if the compensation for which the employer at the at the time of the last injury is liable is less than the compensation provided in this chapter for permanent total disability, then in addition to the compensation for which the employer is liable and after the completion of payment of the compensation by the employer, the employee shall be paid the remainder of the compensation that would be

1. Statutory references are to RSMo 1994, unless otherwise set out.

2. On the other hand, "[i]f there are preexisting injuries which combine with the primary injury to result in PPD [permanent partial disability], statutory thresholds require that

the primary injury result in minimum requirements of fifty weeks for injuries to the body as a whole or fifteen percent for major extremities." *Reese*, 5 S.W.3d at 526; *see* § 287.220.1.

due for permanent total disability under section 287.200 out of a special fund known as the "Second Injury Fund" hereby created exclusively for the purposes as in this section provided and for special weekly benefits in rehabilitation cases as provided in section 287.141.

██ "Any pre-existing injury which could be considered a hinderance [sic] to an employee's competition for employment in the open labor market should trigger Second Injury Fund liability." *Carlson v. Plant Farm*, 952 S.W.2d 369, 373 (Mo.App. 1997); *see Leutzinger*, 895 S.W.2d at 593.

██ "Total disability is defined as the inability to return to any employment and not merely the employment in which the [Claimant] was engaged at the time of the accident." *Id.* at 526; § 287.020.7. "The test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment." *Reese*, 5 S.W.3d at 526; *see Fletcher v. Second Injury Fund*, 922 S.W.2d 402, 404 (Mo.App.1996). "The critical question then becomes whether any employer in the usual course of employment would reasonably be expected to hire this [Claimant] in his or her present physical condition." *Reese*, 5 S.W.3d at 526; *see Carlson*, 952 S.W.2d at 373.

With the foregoing principles in mind, we now review the record. It shows that Claimant has a high school education without any specific formal training except on the job training. Early in his career he assisted his family in the logging business then engaged in heavy, semi-skilled work and undertook other semi-skilled jobs. At one point he was self-employed as a martial arts instructor, a carpenter, a heavy equipment operator, worked for International Hat Company in silk screening on a production line, and had various other jobs in logging or construction that involved substantial physical exertion.

Immediately after the March 21, 1996, accident described previously, he was taken to Salem Memorial Hospital and was seen by an orthopedic physician, Dr. William K. Harris, and was diagnosed with rib fractures and was placed on restricted work. At that time x-rays taken revealed a spondylolisthesis at L5–S1. Claimant returned periodically to Dr. Harris with complaints of low back pain which, at the commencement of the following year, included radiation of pain down to his calf and left leg. He was then referred to Dr. Michael C. Chabot, a spine surgeon. Dr. Chabot noted Claimant walked around in a slow and cautious manner. He then recommended Claimant engage in physical therapy. Additionally, Claimant was sent by Doe Run to see Dr. John R. Wagner, another orthopedic surgeon.

Dr. Wagner described Claimant as having an excellent gait, although he observed Claimant had about a 30 percent loss of motion in the lumbar spine. Dr. Wagner felt, however, that Claimant's pre-existing pars defect and first degree spondylosisthesis, conditions which allowed vertebral slippage in the spinal column, existed prior to his 1996 injury. He opined that the injury itself caused the defect to become symptomatic. He also related that this was the cause of his current complaints of low back and lower extremity symptoms. After subsequent attempts of physical therapy failed, Dr. Wagner expressed the opinion that Claimant would be a candidate for surgery and he was sent to Dr. Michael F. Boland, another surgeon, for further evaluation.

Dr. Boland concurred with Dr. Wagner's evaluation that a lumbar fusion was necessary to alleviate Claimant's symptoms. After a myelogram and post-myelogram CT scan, Claimant underwent surgery on

August 14, 1997, with Dr. Wagner performing the laminectomy and decompression of the nerve roots and Dr. Boland putting in cages.[3] Bone grafting was also performed. However, by March of the following year Claimant continued to complain of pain. He was given a TENS unit which alleviated some of the pain. However, in Dr. Boland's report of April 29, 1998, he opined that Claimant's complaints were almost as bad as existed prior to surgery. By July of 1998, Dr. Wagner had concluded that no additional treatment was indicated and that Claimant had achieved maximum medical improvement. In depositions, Dr. Wagner rated Claimant's lumbar spine with a 25 percent permanent partial disability.

The Fund's vocational expert, Dr. James England—who is not a physician—opined in a letter received in evidence that Claimant had no vocational impairment, per se, prior to the primary 1996 injury. He agreed, however, that if Claimant's pain was as severe as he stated, that Claimant was unemployable in the open labor market.

Claimant's vocational expert, Mr. James Israel, testified at deposition that Claimant had a "vocational impairment" that "existed prior to the March 21, 1996," injury. He also related that Claimant's inability to resume substantial gainful activity was the result of "medically determined limitations from both his primary and pre-existing industrial injuries, specifically back and left knee."

The record further shows that Claimant will be 40 years of age on June 13. At the time of his February 2000 depositions, he weighed 250 pounds and was five feet five inches tall. He testified that while he graduated from high school he attended no other vocational or trade schools, nor did he have any particular specialized training. He stated that he was terminated by Doe Run because he was physically unable to perform his duties due to restrictions imposed on him by his physicians.

In his deposition testimony on February 24, 2000, Claimant described a 1981 sports injury to his right ankle involving torn ligaments. He also described a 1992 knee injury received while working for a construction concern. He underwent two knee surgeries to correct the problem with his knee. He related that thereafter, for the next two years, he was under treatment for weakness and pain and described his left knee as "popping" and "grinding" during this period of time. He also related that thereafter he had to accommodate his injured knee by applying "more weight to my other leg, using my hands and things after being in a semi-squatted position to obtain an upright position." He also indicated that since then he has had difficulties bending, lifting and squatting. While readily admitting that in his last job working for Doe Run he was required to bend, lift and squat, he also related that he was in pain while performing these tasks.

Additionally, Claimant testified that while working for Doe Run he twice had a "ganglion cyst, associated with carpel [sic] tunnel ... removed twice, a year a part," and that his wrist was "still weak" and his "fingers are tingling." Lastly, Claimant testified that he was unable to "sit for very long," had problems with steps, and was very limited on what he could lift. He also related that he felt pain "24 hours a day, seven days a week," and described weakness in his back, left knee and right ankle.

---

**3.** Described by Dr. Wagner as being "an internal fixation device in the vertebral body and fusion of the back."

In his deposition, Dr. C. Chastain testified that he had examined Claimant on March 24, 1999. Dr. Chastain found that Claimant was walking stiffly with a limp; was overweight; short but with wide shoulders and stocky. He was wearing a TENS unit. Dr. Chastain described Claimant as being restless and uncomfortable and shifting his position often and not at ease. He stated Claimant had difficulty undressing and couldn't bend over to get his shoes off. He found Claimant had a "scar overlying the lumbar spine, about a five-inch scar, and that there was no movement of the lumbar spine." He also found that any flexing, tilt or leaning of his back was "achieved in the thoracic spine, on his hips" as opposed to his back. Dr. Chastain found "diminished pinprick sensation on the left lower extremity, that each knee had a full range of motion but that there was a lot of crepitant [described as 'grating' or 'rubbing'] in the left knee" which "you can hear . . . audibly."

During the course of depositions Dr. Chastain also described Claimant's history and treatment arising from Claimant's 1996 injury to his back. Additionally, Dr. Chastain detailed a 1992 injury to Claimant's right knee arising from "basically [being] bent sideways." He related Claimant had undergone two operations involving a "repair of the anterior collateral ligament which was torn;" and surgery for "a lateral release," and indicated that the "knee still bothered [Claimant] a lot" and "still causes some pain." Dr. Chastain also related Claimant underwent operations for "his left wrist for a ganglion" and for injury to the ligaments in his ankle and stated that Claimant had informed him that his ankle was yet "unstable and would sometimes give way on him." On cross-examination Dr. Chastain remarked that Claimant had "a slippage in his back. Two segments, two portions, of one of the vertebra did not develop congenitally and, therefore, that vertebra is weak and it has slipped on the adjacent vertebra in relationship to it so that . . . made him more susceptible to serious injury, which he did have. . . . To me the pain comes from a combination of the preexisting slippage and the injury he had in 1996." Dr. Chastain opined that "I don't think [Claimant] could sit still long enough for a sedentary job." Indeed, Dr. Chastain remarked that "I would find it difficult to think of a job he could do."

Dr. Chastain specifically opined that, based upon a reasonable degree of medical certainty, Claimant's 1992 knee injury constituted a hindrance or an obstacle to employment. Dr. Chastain related that Claimant "has an internal derangement of the knee" and that he "still has some disability in it and it would be a handicap in many employment options he would have." To the question, "do you have an opinion based upon a reasonable degree of medical certainty whether or not the combination of a knee injury and a back injury constitute a hindrance or obstacle to employment?", Dr. Chastain answered: "Yes. The combination of that, the pain that he has in his back complicated by the unstable knee, to my opinion makes him essentially unemployable, 100 percent disabled."[4]

---

4. In an accompanying written report, Dr. Chastain opined that Claimant is "permanently and totally disabled." He observed that "[c]onditions he had prior to the injury of May 1997[sic], including the pars interarticularis defect and spondylolisthesis, and the internal derangement of the left knee, impaired the ability of the employee to work by predisposing him to low back injury, both through the congenital defects and because of the inability to protect his back because of the knee injuries."

Dr. Chastain also testified in depositions that Claimant had "major limitations just in the

In our review of the evidence in this case, including the testimony of Claimant, the two vocational experts and the expert medical witnesses, we observe that the Commission was free to accept or reject any evidence, even medical evidence. *Carlson,* 952 S.W.2d at 375. In its Final Award, the Commission determined that Dr. Chastain credibly testified that the combination of Claimant's pre-existing disability to his knee with the disability to his low back rendered Claimant permanently and totally disabled. "We defer to the Commission on issues concerning credibility and weight to be given to conflicting evidence and testimony." *Maas v. Treasurer of Missouri,* 964 S.W.2d 541, 545 (Mo.App.1998). There was evidence to support the finding that Claimant was permanently and totally disabled. *Kizior,* 5 S.W.3d at 202. We do not find that the Commission's findings, encompassed within its Final Award, are contrary to the overwhelming weight of the evidence. *Id.* at 199; *Reese,* 5 S.W.3d at 525. Point denied. The Final Award of the Commission is affirmed.

SHRUM, P.J., concurs.

MONTGOMERY, J., concurs.

activities of daily living. He can't walk; he can't sit for any length of time; he can walk only a short distance; he has pain with even short automobile rides; he has difficulty getting in and out of certain types of vehicles, especially like a pickup, where he has to lift himself up some to get up to. He has trouble getting in and out of chairs ... can't bend, lift or stoop.... I think the pain prevents him from doing anything that would require mental concentration."