Anthony NANCE, Appellant–
Respondent,

v.

TREASURER OF MISSOURI as Cus-
todian of Second Injury Fund,
Respondent–Appellant.

No. WD 60768.

Missouri Court of Appeals,
Western District.

Oct. 8, 2002.

Arthur H. Stoup, Kansas City, MO, for appellant-respondent.

Anemarie Drees Mura, Kansas City, MO, for respondent-appellant.

Before JOSEPH M. ELLIS, Chief Judge, THOMAS H. NEWTON, Judge and LISA WHITE HARDWICK, Judge.

JOSEPH M. ELLIS, Chief Judge.

Anthony Nance appeals from an award entered by the Labor and Industrial Relations Commission ("the Commission") holding that the Second Injury Fund ("the Fund") was liable to pay him permanent partial disability benefits calculated at five percent of the body as a whole. Nance contends that an award this small was not supported by sufficient evidence and was against the weight of the evidence. The Fund cross-appeals, claiming that the Commission exceeded its authority in making any award against the Fund because Nance had previously voluntarily dismissed his employer from the claim.

On June 23, 1994, Nance was employed as a firefighter for the City of Kansas City, Missouri. That day, in the course of his employment, Nance injured his low back while helping a paramedic carry a 400–pound patient down some stairs in a MAST chair after the paramedic lost her grip on the chair. The City of Kansas City timely filed a report of injury with the Division of Workers' Compensation ("the Division") on August 15, 1994.

Following this injury, the City provided Nance with medical treatment for his injury. Because of his injury, Nance was unable to return to work as a firefighter. He elected, pursuant to an agreement between his union and the City, to receive his full wages rather than the statutory amount allowed for temporary total disability. Pursuant to that agreement, any money paid in excess of the required temporary total disability benefit was to be credited against any settlement or judgment ultimately obtained by Nance under the Workers' Compensation Law.

On June 12, 1995, Nance timely filed a claim for benefits under the Workers' Compensation Law against the City. Nance also made a claim against the Fund. Both the City and the Fund filed timely answers to Nance's claim.

Also in June 1995, the City stopped paying Nance's full wages, and Nance began receiving non-duty disability benefits. Eventually, in June 1998, Nance was awarded duty disability benefits by the City. Pursuant to a Kansas City ordinance, any Workers' Compensation Award would be deducted from his duty disability benefits.

On April 4, 2000, Nance filed a motion voluntarily dismissing his claim against the City because any award against the City would reduce his duty disability benefits in the sum of the award. On April 17, 2000, the Division issued its order dismissing the City from the claim.

Nance's claim against the Fund was heard by an Administrative Law Judge ("ALJ") on February 9, 2001. On March 9, 2001, the ALJ issued her Award, Findings of Fact and Rulings of Law. The ALJ held that Nance could pursue his claim against the Fund under the applicable statutory provisions even though the employer had been dismissed from the action, provided that Nance could establish that he had sustained a compensable injury along with all of the other requisite elements for Fund liability under § 287.220.1.[1] The ALJ then made the following findings, *inter alia:* (1) Nance had proven the requisite elements to establish Fund liability; (2) Nance's June 1994 injury resulted in a twenty-percent permanent partial disability to Nance's body as a whole; (3) prior to his compensable work related injury on June 23, 1994, Nance had permanent disabilities resulting from prior injuries to his right shoulder and right knee that were hindrances and obstacles to his employment; (4) that Nance had a preexisting twenty percent permanent partial disability at the 160–week level as a result of his knee problems and a fifteen percent permanent partial disability at the 232–week level as a result of his shoulder problems; and (5) the simple sums of the preexisting and June 23, 1994, injuries reflected a thirty-seven percent permanent partial disability based on the body as a whole, but the combined effect of the current and preexisting disabilities was greater than the simple sum by five percent of the body as a whole. Based on these findings, the ALJ ordered the Fund to pay compensation to Nance equivalent to five

---

1. All statutory references are to RSMo 2000 unless otherwise noted.

percent of the body as a whole pursuant to § 287.220.1.

Both Nance and the Fund appealed from this Award to the Commission. On October 29, 2001, the Commission issued its Final Award affirming the ALJ's award and incorporating it by reference. Both Nance and the Fund appeal from the Commission's Final Award.

■ We first address the Fund's sole claim in its cross-appeal. The Fund asserts that the Commission acted in excess of its powers in allowing Nance to pursue a claim against the Fund after Nance had dismissed his claim against his employer. The Fund argues that without the employer as a party to the action the issue of the employer's liability for the claimed injury could not be properly litigated or decided and that any determination regarding the compensability of the claimed injury must occur while the employer is a party to the action.

■ In rendering its Award, the Commission found, as a matter of law, that it was not precluded from considering the liability of the Fund under § 287.220.1 simply because Nance had dismissed his claim against the City. Findings of the Commission interpreting or applying the law are not binding on this Court, and our review of such findings is *de novo*. *Carlson v. Plant Farm*, 952 S.W.2d 369, 372–73 (Mo.App. W.D.1997).

Section 287.220.1 provides, in relevant part:

If any employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed, and the preexisting permanent partial disability, if a body as a whole injury, equals a

minimum of fifty weeks of compensation or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability, according to the medical standards that are used in determining such compensation, receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree or percentage of disability, in an amount equal to a minimum of fifty weeks compensation, if a body as a whole injury or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability, caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself, and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability. After the compensation liability of the employer for the last injury, considered alone, has been determined by an administrative law judge or the commission, the degree or percentage of employee's disability that is attributable to all injuries or conditions existing at the time the last injury was sustained shall then be determined by that administrative law judge or by the commission and the degree or percentage of disability which existed prior to the last injury plus the disability resulting from the last injury, if any, considered alone, shall be deducted from the combined disability, and compensation for the balance, if any, shall be paid out of a special fund known as the second injury fund, hereinafter provided for.

A mere cursory reading of § 287.220.1 makes it clear that an employee/claimant must establish that he or she sustained a compensable injury and that the injury caused the requisite level of permanent partial disability as part of his or her claim against the Fund. But nothing in the statutory language requires that the employer still be a party to the action in order for the Commission to make factual findings regarding whether the claimed injury is compensable and the degree of any permanent disability resulting therefrom for which the employer would be liable.

The Fund has not directed us to any legal authority supporting its position, and we find no compelling reason why an employee/claimant should be precluded from pursuing his claim against the Fund simply because he or she elected not to continue pursuing compensation from his or her employer. "Pursuant to section 287.220, the employer is liable only for the percentage of disability for employee's last injury without any pre-existing disability, and the Fund is liable for the balance of the disability found to exist above that found for employee's last injury alone." *Conley v. Treasurer of Missouri*, 999 S.W.2d 269, 275 (Mo.App. E.D.1999). Accordingly, "[s]ection 287.220.1 provides for a separate liability of the employer and the Second Injury Fund," and "[t]he employee's claims against the employer and against the Second Injury Fund are separate proceedings." *Strange v. SCI Bus. Prods.*, 17 S.W.3d 171, 173–74 (Mo.App. E.D.2000).

Because the employer's liability and the Fund's liability are separate, an employee/claimant may settle his or her claim against the employer and continue to pursue a claim against the Fund. *Id.* at 174; *Grant v. Neal*, 381 S.W.2d 838, 842 (Mo. 1964). We can conceive of no reason to treat Nance's dismissal of his claim against

the City any differently that if he had officially entered into a settlement with the City. Regardless of whether an employer remains a party to the claim, the employee/claimant still bears the same burden of proof in order to establish a claim against the Fund.

While the Fund claims that allowing an employee/claimant to dismiss his or her claim against the employer will place an "unreasonable burden on the Fund to have to defend its case" and investigate the available defenses, we do not believe that the convenience of the Fund or its fear that it is not up to the challenge of investigating and defending against claims on its own are compelling reasons to prevent an employee/claimant from settling or dismissing his or her claim against the employer. Likewise, we do not find any evidentiary, legal or logical support for the Fund's dire prediction that a tidal wave of frivolous claims will flood the system if employees are allowed to dismiss their claims against their employer, forego any compensation that they could obtain from the employer, and proceed solely against the Fund. Just as our Supreme Court observed in explaining that employees may settle claims against the employer and continue to pursue a claim against the Fund, "we are unable to see how either party would be prejudiced." *Grant*, 381 S.W.2d at 842–43.

The Commission did not act in excess of its authority in entertaining Nance's claim against the Fund. The Fund's cross-appeal is denied.

■ We next turn to Nance's appeal. Nance contends that the Commission's award of five percent of the body as a whole was not supported by the evidence and was against the weight of the evi-

dence.[2] Nance argues that the "undisputed" evidence establishes that he was entitled to an award of at least twenty percent of the body as a whole from the Fund.

Our standard of review is set forth in *Davis v. Research Medical Center*, 903 S.W.2d 557, 571 (Mo.App. W.D.1995):

> The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as

the reasons, if any are given, why the Commission differed with those findings.

Under § 287.220, " 'when the combination of a preexisting disability with a compensable disability results in a greater disability than the sum of the two disabilities considered independently, the Second Injury Fund is liable for the difference between the sum of the two disabilities and the disability resulting from their combination.' " *Smart v. Missouri State Treasurer*, 916 S.W.2d 367, 368 (Mo.App. S.D.1996) (quoting *Anderson v. Emerson Elec. Co.*, 698 S.W.2d 574, 576 (Mo.App. E.D.1985)). Section 287.220.1 sets forth a four-step process applicable when calculating the compensation due an employee, and from what source, in cases involving permanent disability:

> (1) The employer's liability is considered in isolation—"the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability;" (2) Next, the degree or percentage of the employee's disability attributable to all injuries existing at the time of the accident is considered; (3) The degree or percentage of disability existing prior to the last injury, combined with the disability resulting from the last injury, considered alone, is deducted from the combined disability; and (4) The balance becomes the responsibility of the Second Injury Fund.

*Kizior v. Trans World Airlines*, 5 S.W.3d 195, 200 (Mo.App. W.D.1999) (quoting § 287.220.1 ).

**2.** Given our resolution of the Fund's cross-appeal, we need not address Nance's second point on appeal. That point challenges the Commission's exclusion of Exhibit G from evidence. The only relevance Nance claims that exhibit had to the proceedings was to help in countering the Fund's argument that the Division lacked jurisdiction to consider

the case due to the dismissal of the employer. Having determined that the Commission properly found that it had the authority to consider Nance's claim against the fund regardless of the contents of Exhibit G, Nance cannot have been prejudiced by the exclusion of this exhibit.

Nance argues that the Commission erred in each step of its calculations, resulting in an award against the Fund that was lower than the evidence would support. Interestingly, most of Nance's argument focuses on claims that the Commission's assessment of both his preexisting disabilities and his disability resulting from the June 23, 1994 injury were too low based upon the evidence before it. Under the formula for calculating Fund liability, any increase in these numbers could only maintain or reduce the amount of compensation due from the Fund, absent a disproportionate corresponding increase in the overall level of disability. Nevertheless, we will briefly address each of Nance's arguments in assessing whether the Commission's award was improperly calculated.

■■ Nance first argues that the Commission's finding that he sustained a twenty percent permanent partial disability as a result of his June 23, 1994 injury was not supported by the evidence and was against the overwhelming weight of the evidence. He contends that the Commission could not have reasonably found a degree of disability lower than the forty percent permanent partial disability assigned by the doctor he retained to provide an independent medical evaluation, Dr. Koprivica.

Dr. Koprivica opined that Nance had sustained a twenty percent permanent partial disability to the body as a whole related to his disk herniation, but that psychological impairment due to depression caused by the back injury resulted in an additional fifteen percent disability to the body as a whole. Dr. Koprivica then stated that the back injury and psychological injury combined to create a forty percent permanent partial disability to the body as a whole. Nance argues that the Commission could not reasonably find that his disability was any lower than that estimated by Dr. Koprivica.

■■ "The determination of a specific amount or percentage of disability awarded to a claimant is a finding of fact within the province of the Commission, and this court will not substitute its judgment for that of the Commission even if this court would have made a different initial conclusion." *Sifferman v. Sears, Roebuck & Co.,* 906 S.W.2d 823, 826 (Mo.App. S.D.1995). The Commission "may consider all of the evidence, including the testimony of the employee, and draw all reasonable inferences in arriving at the percentage of disability." *Doria v. Chemetron Corp.,* 784 S.W.2d 323, 325 (Mo.App. S.D.1990). " 'The Commission is not bound by the expert's exact percentages and is free to find a disability rating higher or lower than that expressed in medical testimony.' " *Ransburg v. Great Plains Drilling,* 22 S.W.3d 726, 732 (Mo.App. W.D.2000) (quoting *Sifferman,* 906 S.W.2d at 826).

Having reviewed the record in this case, we find that the Commission's assessment of a twenty percent permanent partial disability as a result of the June 23, 1994 injury was supported by the evidence and was not against the weight of the evidence. Nance's treating physician, Dr. Bruce, rated his permanent disability from his back injury as five percent to the body as a whole. Accordingly, the Commission's assessment clearly fell within the range of the ratings contained in the record.

Moreover, contrary to Nance's assertions, the Commission was not bound to accept Dr. Koprivica's assessment of Nance's psychological impairment. Dr. Koprivica merely stated that, although he was not a psychologist or psychiatrist, after reviewing the psychiatric records, he felt that depression resulting from the injury on June 23, 1994, caused an additional fifteen percent permanent partial disability. Neither Dr. Koprivica's report nor his testimony indicate how Nance was dis-

abled or impaired by his depression or place any work restrictions on him based upon that condition.

The psychiatric records indicate that Nance did not receive psychiatric treatment from February 9, 1994, through October 17, 1996. Thus, Nance did not seek treatment for depression for well over two years after his claimed injury. The notes from October 17, 1996, reflect that Nance was seeking treatment because he was feeling stressed due to family matters and financial concerns. No mention of his back injury appears in those notes. Subsequent records indicate that Nance was depressed over his mother having been diagnosed with terminal cancer and later records indicate further depression caused by her death. From these records, the Commission could reasonably have found that any depression suffered by Nance was not causally connected to his injury on June 23, 1994.

Furthermore, Nance's testimony reflects that he has had numerous other jobs since his June 23, 1994 injury. While he testified that his physical problems eventually caused him to quit each of those jobs, he offered no testimony indicating that his psychological condition played any role in his ability to obtain or maintain employment. Likewise, neither the psychiatric records nor Dr. Koprivica's testimony identify any way in which Nance's depression impaired his ability to work or perform any of the other activities of everyday life. The records merely reflect that he was placed on various anti-depressant medications, which apparently helped his condition. The Commission could reasonably have determined that Nance did not have any permanent disability resulting from his depression.

In sum, the Commission's assessment of Nance's permanent partial disability resulting from the June 23, 1994 injury at twenty percent to the body as a whole is supported by the record and is not against the overwhelming weight of the evidence. The assessment falls right in the middle of the ratings provided by Dr. Bruce and Dr. Koprivica. Furthermore, with regard to any depression suffered by Nance after June 23, 1994, the Commission could reasonably have determined that it was not causally connected to his injury and/or that Nance did not suffer any permanent disability as a result of his depression.

Nance also contends that the Commission erroneously found that his preexisting deep venous thrombosis and depression either were not permanent or were not hindrances or obstacles to his employment at the time of his June 23, 1994 injury. He asserts that the Commission should have accepted Dr. Koprivica's assessments related to those preexisting conditions and that any conclusion to the contrary was not supported by the evidence and was against the weight of the evidence.

■ With regard to his deep venous thrombosis, Nance contends that the Commission was obligated to accept Dr. Koprivica's assessment that Nance had a twenty percent permanent partial disability at the level of the hip as a result of that condition. Nance is in error. The Commission was not obligated to accept Dr. Koprivica's assessment and could reasonably have determined that his opinion was not entitled to much, if any, weight. Dr. Koprivica acknowledged on cross-examination that he had not reviewed any of the medical records related to Nance's treatment for this condition, and he did not identify any way in which this condition had served as a hindrance or obstacle to his employment.

The record reflects that Nance developed a blood clot in 1991. He was diagnosed with deep venous thrombosis and was treated with the medicine Coumadin.

Nance himself testified that he had no further episodes of blood clots after the initial 1991 incident and that his doctor took him off the Coumadin in 1995. There was no evidence this condition restricted Nance's ability to work or otherwise maintain employment. The Commission found that any disability resulting from this condition was not permanent and/or was not "a hindrance or obstacle to employment or to obtaining reemployment." Such a finding is supported by sufficient evidence and is not against the weight of the evidence.

Similarly, the Commission could reasonably have disregarded Dr. Koprivica's opinion that Nance had a fifteen percent preexisting permanent partial disability from depression at the time of his 1994 injury. As noted previously, Dr. Koprivica testified that he was not a psychiatrist or psychologist. Dr. Koprivica purportedly relied entirely upon a review of the psychiatric records from Kaiser Permanente in reaching his conclusion regarding the existence of a fifteen percent preexisting permanent partial disability due to depression. But those records do not establish that Nance's preexisting depression was permanent or that it caused any hindrance or obstacle to his employment.

The Kaiser Permanente records reveal that Nance sought psychiatric treatment on December 27, 1993. At that time, Nance indicated that he had been in an increasingly depressed mood over the previous year related to several recent deaths in his family, health concerns, work stress, and family pressures. Nance was seen again on February 9, 1994, at which time anti-depressant medications were prescribed for him. None of the records indicate that his depression was causing him any difficulty in performing his work or

that it would hinder him in finding other employment. After February 9, 1994, Nance did not seek psychiatric treatment again until October 17, 1996. The records from that date indicate that Nance had ceased taking medication for depression in March 1994. Nance testified at the hearing that he did not believe that he was having any psychological difficulties at the time of his June 23, 1994 injury. Furthermore, a letter written by Dr. Samuel Hucke, who provided psychiatric treatment to Nance, on November 17, 1999, opined that Nance's current depression was caused by his June 23, 1994 injury.[3] Thus, there was sufficient competent evidence in the record to support the Commission's finding that Nance's preexisting depression was not permanent and/or was not a hindrance or obstacle to his employment, and that determination was not against the overwhelming weight of the evidence.

 Finally, Nance argues that the Commission erred in determining the combined effect of his preexisting injuries and June 23, 1994 injury. He claims that the Commission should have accepted Dr. Koprivica's assessment that the combination of his preexisting disabilities and the disability resulting from his June 23, 1994 injury resulted in a twenty percent enhancement to his overall disability at the level of the body as a whole over and above the mathematical sum of those disabilities. Contrary to Nance's assertions, "'[t]he Commission is not bound by the expert's exact percentages and is free to find a disability rating higher or lower than that expressed in medical testimony.'" *Ransburg*, 22 S.W.3d at 732 (quoting *Sifferman*, 906 S.W.2d at 826).

---

**3.** That letter did not indicate that Nance had any permanent partial disability as a result of his depression.

Having carefully reviewed the record, we find that the Commission's award is supported by sufficient competent and substantial evidence, and that it is not against the overwhelming weight of the evidence. *Davis*, 903 S.W.2d at 571. Accordingly, the Commission's award is affirmed.

All concur.